**In re Donald Joseph GUY, Debtor.**

**Gene A. LEEB, Ronald J. George, Maureen McClinchy Wagner & Robert W. Bales, Plaintiffs,**

v.

**Donald Joseph GUY, Defendant.**

**Bankruptcy No. 85–60236.
Adv. No. 85–6050.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division,
at Gary/Lafayette.

April 28, 1988.

R. Cordell Funk, Hammond, Ind., for plaintiff.

Charles Enslen, Highland, Ind., for defendant.

## MEMORANDUM OPINION AND ORDER

KENT LINDQUIST, Chief Judge.

### I

*Statement of Proceedings*

The Plaintiffs filed their nondischargeability complaint versus the Defendant, Donald Joseph Guy (hereinafter: "Debtor") under the above-captioned adversary proceeding number on June 14, 1985 alleging that a certain indebtedness to them by the Debtor is nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (4) and (6).

The basis for the Plaintiffs' assertion of nondischargeability is a certain judgment entered in favor of the Plaintiffs versus the Defendant in the United States District Court for the Northern District of Indiana, Hammond Division on November 19, 1984, under Cause No. 80–220 in the sum of $46,106.87. This action was fully tried on the merits. The damages awarded in said judgment were broken down as follows: 1) $20,369.39 for the remaining principal amount due on contracts sued upon; 2) $17,737.48 in prejudgment interest for a total of $38,106.87 in compensatory damages; and, 3) $8,000.00 in punitive damages. A copy of said judgment is attached to Plaintiffs' complaint as Exhibit "A" and a copy of the court order on which said judgment is based is attached as Exhibit "B". The Debtor filed answer on June 24, 1985, and admitted rhetorical paragraph one of the Plaintiffs' complaint that said judgment had been entered (Exhibit "A") and the first sentence of rhetorical paragraph two relating to the entry of the

findings and order concerning said judgment (Exhibit "B").

The District Court specifically found in its judgment of November 20, 1984, that the Plaintiffs had established by clear and convincing evidence the existence of tortious misconduct and thus formed the basis for the award of $8,000.00 in punitive damages.

The Court's Order of November 19, 1984 upon which said judgment was rendered, made the following findings of fact:

## Findings of Fact

The parties stipulated to the following findings of fact:

1) On June 1, 1978, the parties entered into a written agreement wherein the four plaintiffs were individual investors, and the defendant was a security analyst who was given almost unlimited authority to invest funds supplied by plaintiffs.

2) Each plaintiff signed a separate written contract with the defendant entitled "Sussex Vampire Fund Agreement of Limited Partnership". The purpose of the partnership was the buying and selling of commodity futures contracts.

3) The four written contracts, all of which were identical, established the rules the plaintiff-investors and the defendant-investor would follow in this venture. The defendant, Donald J. Guy, drafted the contract and had used similar contracts in similar ventures in the past.

4) Initially, Leeb, et al., gave Guy $60,-000.00 for one hundred twenty (120) shares in the limited partnership, equalling $500.00 per share. Guy was to invest this amount in the futures market, until the fund dropped below $30,000.00 at which time the unused funds were to be returned.

5) Plaintiffs made the following investments:

| | | | | |
|---|---|---|---|---|
| (a) | Leeb | $25,000 | 50 shares | 06–01–78 |
| (b) | George | $25,000 | 50 shares | 06–01–78 |
| (c) | McClinchy | $25,000 | 10 shares | 06–01–78 |
| (d) | Bales | $ 5,000 | 10 shares | 05–11–78 |
| (e) | McClinchy | $ 5,800 | 10 shares | 10–01–78 |

6) On October 1, 1978, Guy induced Maureen McClinchy to invest an additional $5,800.00 for ten (10) shares. McClinchy was led to believe the shares were worth $580.00 per share at that time based upon representations from Guy, when in fact the shares were worth only $254.00. These additional monies increased the initial investments of Leeb, et al., to $65,-800.00.

7) The agreement entered into between Leeb, et al., and Guy, required the following:

a. Each month the General Partner will issue a report to the Limited Partners of the "net asset value" of each limited partnership unit as of the end of the month. (Paragraph 6.2 of the contract).

b. The General Partner shall deliver to each Limited Partner within (sixty) 60 days after December 31 of each year a statement of receipts and expenses together with a statement showing the profits and losses of fund for federal income tax purposes. (Article IV of the contract).

c. Upon dissolution and failure to reconstitute, accounting shall be made of the financial affairs of the Partnership. Thereupon, the General Partner ... shall act as liquidating Trustee and immediately proceed to wind up and terminate the business and affairs of the Partnership. (Paragraph 5.2 of the contract).

d. Upon the reduction from the initial value of $500.00 per share to $250.00 per share (Net Asset Value), the Partnership shall immediately be dissolved. (Paragraph 5.1 of the contract).

e. A Limited Partner shall be entitled to return of his contribution upon dissolution of the partnership. (Paragraph 3.4 of the contract).

8) Guy was designated the General Partner, and made only one written report to Leeb, et al. The report was issued July 3, 1978.

9) Guy made misleading oral reports to the plaintiffs, upon which they relied to their detriment.

10) Guy failed to timely transmit tax information, as required pursuant to contract.

11) When the value of the fund dropped below the one-half mark on December 26, 1978, instead of liquidating the fund pursuant to agreed upon contract terms, Guy knowingly reinvested the monies without authority from Leeb, et al., and without attempting to advise Leeb, et al. of his intent to reinvest. Guy knew the value of each share was below $250.00 at the time of reinvestment.

12) On February 7, 1979, Guy liquidated the fund and realized approximately $111.00 per share, or a total of $13,-630.61. Guy did not inform Leeb, et al., of the liquidation.

13) At the inception of the venture, each share was worth $500.00, and pursuant to contract, Guy was required to liquidate when the value per share fell to $250.00.

14) On April 8, 1979, pursuant to a letter, Gene A. Leeb and Ronald J. George demanded to examine the partnership records.

15) On July 13, 1979, pursuant to letter, Guy was informed that Leeb, et al., retained counsel to represent them. At that time Leeb, et al., demanded an opportunity to inspect the books, requested a statement of receipts and expenses, and demanded that Guy submit to binding arbitration to determine the amount of money due.

16) On August 23, 1979, Guy was advised, pursuant to letter, that Leeb, et al., elected to rescind their purchase of units in the limited partnership and to demand an immediate refund of the entire purchase price.

17) Guy withheld the funds realized, despite repeated demands, in a separate, non-interest bearing account until March 16, 1981, when he delivered to Leeb, et al., the sum of $12,130.61.

18) On March 25, 1979, Guy delivered to Leeb, et al., a notice that the partnership was in the process of being closed out and that final audit and report on final position, plus a check, would be forthcoming.

19) Thereafter, Guy refused to return the monies realized unless Leeb, et al., would agree to sign a release. This withholding of funds was an attempt to force settlement. When this attempt failed, Guy delivered $12,130.61 to Leeb, et al., on March 16, 1981.

20) Guy converted a portion of the $13,-620.61 realized upon liquidation, in that he utilized $1,500.00 of those funds to pay an attorney to defend the action initiated by Leeb, et al. against him. This use of partnership funds was in violation of the terms of the agreement entered June 1, 1978, between Leeb, et al., and Guy. [Article II Sections 2.1 and 2.2].

21) Guy also converted the following monies from the fund in that he received money from the checking account of the Sussex Vampire Fund without authority and for his own personal use:

(a) $1,000.00 on 6–07–78

(b) $133.78 on 7–01–78

(c) $1,200.00 on 8–27–78

22) Guy also converted to his own benefit $4,000.00 on October 20, 1978, from the Sussex Vampire Fund. Specifically, he withdrew that money from the Sussex Vampire fund and Paid it to another fund to which none of the plaintiffs contributed nor from which they would gain any benefit.

23) Guy withdrew a total of $7,883.78 from the Sussex Vampire Fund between June of 1978 and October of 1978 without the consent of Leeb, et al., contrary to the partnership agreement and for his own personal benefit.

24) Pursuant to contract, Leeb, et al. were entitled to $32,500.00 on December 26, 1978. That figure was reached in multiplying the number of shares (130) by their net worth on that date ($250.00). On February 7, 1979, the fund was liquidated and approximately $111.00 per share was realized, totaling $13,630.61. On March 16, 1981, $12,130.61 was delivered to Leeb, et al. leaving $20,369.39 due.

25) Leeb, et al. lost 12 percent interest on funds they did not receive.

The District Court in its "Memorandum" following the above finding of facts noted that the parties had stipulated that the

$32,500.00 was due the Plaintiffs by the Debtor on or about January 1, 1979, that a demand for payment was made, and that on or about March 1, 1981, the Debtor paid $12,130.61 to the Plaintiffs on or about March 1, 1981.

The initial question addressed by the District Court was whether the Plaintiffs were entitled to pre-judgment interest pursuant to Indiana law on the principal sum due. The Court held that pre-judgment interest at the rate of 12% per annum was recoverable pursuant to Indiana Code 24–4.6–1–101 on the grounds that the parties had so stipulated to that rate and the damages were clearly "ascertainable" by the Court relying on relevant Indiana case law as set out therein. (pp. 5–9 of the Court's order of November 19, 1984; Exhibit "B" to Plaintiffs' complaint).

The District Court next addressed the issue of whether the Plaintiffs' request that the Court assess punitive damages should be allowed (pp. 9–14 of the Court's order of November 19, 1984; Exhibit "B" to Plaintiffs' complaint).

The Court discussed in detail that in proper circumstances, Indiana case law allows punitive damages to be awarded in breach of contract cases. The Court held as follows:

> It is, … clear under Indiana law that in the proper circumstances punitive damages may be awarded on a tort theory in a breach of contract case. *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir.1979). The law which governs the award of punitive damages in contract actions was definitely set out by the Indiana Supreme Court in *Vernon Fire & Casualty Ins. Co. v. Sharp*, [264 Ind. 599] 349 N.E.2d 173 (Ind.1976). Therein the court recognized an exception to the general rule that punitive damages are not recoverable in contract actions. The Court restricted this exception to those instances in which the evidence: (1) independently establishes the elements of a common law tort, or (2) shows that a serious wrong, tortious in nature, has been committed in an instance in which the public interest would be served by the deterrent effect puni-

tive damages would have upon the future conduct of the wrongdoer and parties similarly situated. *Id.* 349 N.E.2d at 180.

> However, courts have long recognized that a good faith dispute as to what a contract requires will never supply the grounds for punitive damages. *First Federal Savings and Loan Assoc. of Indianapolis v. Mudgett*, 397 N.E.2d 1002 (Ind.App.1979). In discussing the differences between those contract actions in which punitive damages are appropriate and those in which they are not, the Court in *First Federal* stated:

>> … the legitimate exercise of the "right to disagree" may directly result in intentional infliction of temporal damage; but that the infliction of such damage is generally regarded as privileged, *Vernon, supra.* Courts must be careful not to discourage honest litigation by allowing punitive damages against a party who is merely exercising his right to adjudicate an honest dispute even if he is found to be in error and even if his litigation injures the other party. 8 Ind.Law Review 668, *supra.* In *Vernon, supra,* we also stressed that a promisor's motive for breaching his contract is generally irrelevant and that even a breach indicating substandard business conduct does not entitle the promisee to mulct the promisor in punitive damages.

>> On the other hand, as Judges Buchanan and Garrard have emphasized, punitive damages are appropriate where there is evidence of an independent tort of a 'reprehensible' nature, where the record indicates a state of mind evidencing bad faith, or where the actor's conduct has a quality that characterizes it as 'reprehensible' as where there is evidence of a consciousness of an intended or probable effect calculated to unlawfully injure the personal safety or property rights of others. *Hibschman Pontiac, supra; Vernon, supra.* Such conduct is not privileged. *Id.* at 1008.

> Case law thus supports the award of punitive damages in certain breach of

contract cases, if the evidence sustains findings of elements of fraud, malice, gross negligence or oppression mingled with the breaches. *Travelers [Indemnity Company v. Armstrong]*, 442 N.E.2d 349 [ (Ind., 1982) ]. The Court in *Travelers* addressed prior case law in which the award of punitive damages was deemed appropriate. *Id.* at 359. In addressing those cases the court said:

> We find no fault with the end result in these cases, but it becomes apparent, from them, that the advent of punitive damages in contract cases, absent evidence of an attendant full blown tort of a nature which would permit punitive damages in and of itself, has given rise to a need for the adoption of an evidentiary standard not heretofore required, lest the public policy favoring such awards be subverted. *Id.* at 360.

*The Indiana Supreme Court's recent opinion in Travelers changed Indiana law so that punitive damages must be proven by the stricter evidentiary requirement of clear and convincing evidence.* *Id.* Therein the court stated:

> [P]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law, or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing
>
> . . .
>
> . . . a requirement of proof by clear and convincing evidence furthers the public interest when punitive damages are sought.

*The propriety of the clear and convincing evidence standard is particularly evident in contract cases, because the breach itself for whatever reason, will almost invariably be regarded by the complaining party as oppressive, if not outright fraudulent.*

The public interest cannot be served by any policy that deters resort to the courts for the determination of bona fide commercial disputes. *Id.* at 362–63.

Thus the standard to be utilized by the court in a tortious breach of contract case where there is a request for punitive damages is well established, yet the Appellate Courts are in apparent disagreement as to what *type* of misconduct will support an award of punitive damages.

There is no disagreement that when the evidence independently establishes the elements of a common law tort, punitive damages are appropriate. The *facts indicate the presence of both fraud and conversion* by Guy. Fraud is defined as:

> "The intentional deception, relied upon by another which induces him to part with property or surrender a legal right. . . ."

*Guy v. Schuldt*, 138 N.E.2d 891, 895 (Ind.1956).

Thus the following elements must be established before the independent tort of fraud is found to exist: (1) Material misrepresentation of past or existing fact; (2) falsity of representation upon which the actor of a fraud is predicated; (3) alleged misrepresentation was known to be false or made recklessly; (4) reliance, such reliance being reasonable and not predicated upon matters of subjective future intent or probability; and (5) damages. *Tutwiler v. Snodgrass*, 428 N.E.2d 1291 (Ind.App.1981). *Clearly, a fraud was committed against Maureen McClinchy in that Guy misrepresented the worth of stock sold to her. Furthermore, the parties stipulated to the fact that Guy made "misleading oral reports, upon which the plaintiffs relied to their detriment."*

Alternatively, had the parties not stipulated as to the existence of fraudulent misrepresentations, case law supports the view that an independent tort need not always be established. *Vernon Fire and Casualty Ins. Co., supra.* Thus, "when a serious wrong, tortious in nature, has been committed but the wrong does not conveniently fit the confines of

a pre-determined tort," *Vernon,* supra at 180, punitive damages are justified, if the public interest will be served by the deterrent effect. *Id.* Conduct "tortious in nature" has been interpreted to mean that evidence of "fraud, malice, gross negligence or oppression" mingle with the controversy. *Vernon, supra.*

Though it is clear that actionable fraud is not required in order to award punitive damages in a contract action, the appellate courts in Indiana are apparently in disagreement as to what exactly is required. In *Miller Pipeline Corporation [v. Broeker],* 460 N.E.2d 177 (Ind.App. 2 Dist.1984), the court reversed an award of punitive damages holding that conduct for which punitive damages may be awarded must demonstrate malice or an equivalent state of mind and that a heedless disregard of the consequences, absent an oppression or malicious state of mind, was insufficient to justify such an award. This was re-affirmed by the court on a petition for re-hearing, *Miller Pipeline Corp. v. Broeker,* 464 N.E.2d 12 (Ind.App. 2nd Dist.1984) despite the ruling by the Fourth District in *Orkin Exterminating Co. Inc. v. [Traina] Tiana,* 461 N.E.2d 693 (Ind.App. 4th Dist. 1984), issued in the interim. In *Orkin,* the court held that willful or wanton misconduct alone will support an award of punitive damages. Thus, the court in *Orkin* contemplates that the conduct necessary for an award of punitive damages is considerably less than the malice standard enunciated in *Miller Pipeline.*

*It is clear that the conduct of the defendant, Guy in this case, falls within the scope of misconduct found by other courts in the past sufficient to justify an award of punitive damages.* This is not a "good faith" contract dispute, as was addressed by the court in *Mudgett, supra.* The tortious conduct involved economic duress, as recognized in *Vernon, supra,* and *Jones v. Alviani, supra,* and was also calculated to attempt to delay performance and ultimately escape full liability through forced settlement. *The relationship between the parties is fiduciary in nature, thus cre-ating a higher duty of care owed to plaintiffs by defendant.* This can be distinguished from the mortgagor-mortgagee relationship discussed by the court in *Prudential Ins. Co. [v. Executive Estates, Inc.],* [174 Ind.App. 674,] 369 N.E.2d [1117] at 1126 [ [(1977) ], wherein the court denied an award of punitive damages. Finally, the case at bar is a particularly appropriate instance where the public interest is served by the punishment that is inflicted on the wrongdoer. *The test set forth in Travelers is also met in that the evidence is inconsistent with the hypothesis that the tortious conduct was the result of "a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing." Id.* at 442. Thus, the requirements set forth in *Vernon, supra,* are met, and the only remaining issue is the amount of punitive damages appropriate in this case.

In its conclusions of law in its Order of November 19, 1984, the Court held as to the relevant portions thereof as follows:

2. Plaintiffs have established the alleged violation of fraudulent breach of contract and willful withholding of funds by Defendant in violation of Indiana tort law and contracted law.

\*　　\*　　\*　　\*　　\*　　\*

4. *Plaintiffs have established by clear and convincing evidence the existence of tortious misconduct and are entitled to punitive damages in the amount of $8,000.00.*

(P. 15 of the Court's Order of November 19, 1984; Exhibit "B" to Plaintiff's complaint) (Emphasis added).

The stipulation of facts filed by the parties in the District Court on November 10, 1981, refers to four separate written contracts that each of the Plaintiffs and the Debtor entered into, entitled "Sussex Vampire Fund Agreement Limited Partnership." The purpose of the partnership was the buying and selling of commodity futures contracts. The four contracts, all of which were identical, established the rules

that the Plaintiff investors and the Debtor-investor would follow in the venture. The Debtor had drafted the contract and used similar contracts in similar ventures on four or five other occasions. The four contracts are referred to in the stipulation of facts between the parties filed November 10, 1981 with the District Court as Exhibits 1–4 (*See* p. 1 of Exhibit "C" to Plaintiffs' Motion for Summary Judgment). The contracts were not in fact attached to Exhibit "C", and by Court Order of January 28, 1987, the Court ordered the Plaintiff to file the same. On February 11, 1987, the Plaintiffs filed their response to the January 28, 1987 order and filed Exhibit "1" to Exhibit "C" and the signature pages to Exhibits "2", "3" and "4" to Exhibit "C".

On November 27, 1985, the Plaintiffs filed their Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56 on the grounds that there is no genuine issue of material fact and that the Plaintiffs are entitled to a judgment as a matter of law that the debt arising from Order and Judgment entered in the district Court is nondischargeable in the Debtor's bankruptcy pursuant to 11 U.S.C. § 523(a)(2), (4) and (6). The Plaintiffs noted in their motion that no oral evidence or trial was necessitated by the District Court in that the parties stipulated to certain facts (Exhibit "C" to Plaintiffs' Motion), and that the Debtor never responded to certain requests for admissions which are deemed admitted pursuant to Fed.R.Civ.P. 36 (Exhibits "D", "E", "F" and "G" to Plaintiffs' motion). Nevertheless this case was submitted on the merits. However, even though the District Court judgment was not a default judgment it does not have *res judicata* (claims preclusion) effect in a nondischargeability adversary proceeding in this Court. *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *In re Rudd, (Estate of David Schubert Deceased, and David Schubert v. Rudd*, 104 B.R. 8, 10–22 (Bankr.N.D.Ind.1987).

However, the Supreme Court in *Brown v. Felsen*, in ruling that *res judicata* did not preclude the bankruptcy court from going behind a prior state court judgment to determine if a debt is nondischargeable stated in a footnote that collateral estoppel should be applied if the state court's factual findings were based on standards identical to those used by the bankruptcy court in its dischargeability determination. The court stated:

> This case concerns *res judicata* only, and not the narrower principle of collateral estoppel. Whereas *res judicata* forecloses all that which might have been litigated previously, collateral estoppel treats as final only those questions actually and necessarily decided in a prior suit. [citations omitted] If, in the course of adjudicating a state-law question, a state court should determine factual issues using standards identical to those of § 17, then collateral estoppel, in the absence of countervailing statutory policy, would bar litigation of those issues in bankruptcy court.

*Brown*, 442 U.S. at 139 n. 10, 99 S.Ct. at 2213 n. 10.

A majority of the courts have adhered to the foregoing analysis by the Supreme Court and applied collateral estoppel when the state law standards as those required to prove nondischargeability of debt under the Bankruptcy Code. *See Spilman v. Harley*, 656 F.2d 224, 227 (6th Cir.1981); *Matter of Merrill*, 594 F.2d 1064, 1067 (5th Cir.1979); *Matter of Ross*, 602 F.2d 604, 607–08 (3d Cir.1979); *In re Shepherd*, 56 B.R. 218, 219 (W.D.Va.1985); *In re Bishop*, 55 B.R. 687, 688–89 (Bankr.W.D.Ky.1985); *In re Perrin*, 55 B.R. 401, 402 (Bankr.D.N.D.1985); *In re D'Annolfo*, 54 B.R. 887, 888–89 (Bankr.D.Mass.1985).

This Court has also held when a case is actually litigated on the merits, although the prior judgment cannot be given *res judicata* or claim preclusions effect, if all of the four elements of collateral estoppel or issue preclusions are present, and the non-bankruptcy court applies the same clear and convincing standard of proof, which the Bankruptcy Court must apply in the context of a nondischargeability proceeding, the findings of fact by that Court

can have collateral estoppel application in any subsequent nondischargeability proceeding. *See In re Tomsic, (Gellenbeck v. Tomsic,* 104 B.R. 22, 29–40 (Bankr.N.D.Ind. 1987)..

The Seventh Circuit in the recent case of *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir.1987), held that where a state court determines factual questions using the same standards as the bankruptcy court would use, collateral estoppel should be applied to promote judicial economy by encouraging the parties to present their strongest arguments, and thus if the requirements for applying collateral estoppel have been satisfied, then the doctrine should apply to bar relitigation of an issue determined by a state court.

As noted by the *Klingman* Court, the four requirements for collateral estoppel are 1) the issue sought to be precluded must be the same issue as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action. *Klingman v. Levinson,* 831 F.2d at 1295, *supra.* A Federal Court must apply the same issue preclusive effect to state court judgments, which would be given in courts of the state from which they emerged and can give neither less nor more preclusive effect than would those state courts. *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274, *rehg. den.* 471 U.S. 1062, 105 S.Ct. 2127, 85 L.Ed.2d 491, on remand 628 F.Supp. 918; *Kirk v. Board of Educ. of Bremen Community High School, Dist. No. 228, Cook County, Illinois,* 811 F.2d 347 (7th Cir.1987); *Cook County v. Mid-Con Corp.,* 773 F.2d 892 (7th Cir.1985) (applying state preclusion law as to effect of state court judgment based on federal statute).

■ However, because the prior litigation here was brought in a federal court, the federal rule of collateral estoppel or issue preclusion would apply rather than the state standards of collateral estoppel or claim preclusion. *Fireman's Fund Ins. Co. v. International Market Place,* 773 F.2d 1068 (9th Cir.1985); *Freeman v. Lester Coggins Trucking, Inc.,* 771 F.2d 860 (5th Cir.1985). *Cf. In the Matter of Energy Cooperative,* 814 F.2d 1226, 1230–31 (7th Cir.1987) (applying the federal rule of *res judicata* or claim preclusion where prior litigation was brought in federal court, *Citing, Car Carriers, Inc. v. Ford Motor Co.,* 789 F.2d 589, 593, whereby the Court applied the "operative facts" or "same transaction" test to define "cause of action" and holding that "once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or lost.")

■ The Court would note that the standard of proof to be applied in a nondischargeability proceeding under §§ 523(a)(2)(A), (4) and (6), is that of clear and convincing evidence, rather than by a preponderance of the evidence. *In re Kimzey,* 761 F.2d 421, 423–24 (7th Cir.1985) (§ 523(a)(2)(A)), *In re Peoni,* 67 B.R. 288, 291 (Bankr.S.D.Ind.1986) (§ 523(a)(6)), *citing, In re Kaufmann,* 57 B.R. 644 (Bankr. E.D.Wis.1986) (§ 523(a)(2)(A)) and § 523(a)(6), and *Matter of Wintrow,* 57 B.R. 695 (Bankr.S.D.Ohio 1986), and *In re Egan,* 52 B.R. 501 (Bankr.D.Minn.1985) (§ 523(a)(6)); *In re Sutton,* 39 B.R. 390 (Bankr.M.D.Tenn.1984) (§ 523(a)(4)); *In re Graziano,* 35 B.R. 589, 593 (Bankr.E.D.N. Y.1983) (§ 523(a)(4)).

■ The Supreme Court in the case of *Anderson, et. al. v. Liberty Lobby, Inc. and Willis A. Carto,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) held that in determining whether a factual dispute exists on a motion for summary judgment, the court must be guided by the substantive evidentiary standards of the case that are applicable at trial, and thus in ruling on a motion for summary judgment the Supreme Court held that the court must apply the clear and convincing standard in a case where the actual malice rule applied, and this was thus the standard of proof for such a claim.

Thus, the court must apply the clear and convincing standard of proof in this adversary proceeding in testing the sufficiency of the Plaintiff's motion for summary judgment.

 Inasmuch as the District Court clearly applied the clear and convincing standard of proof in awarding punitive damages to the Plaintiffs, pursuant to Indiana law, i.e. by applying the case of *Travelers Indemnity Co. v. Armstrong,* 442 N.E.2d 349, 362–63 (Ind.Sup.Ct.1982), the findings of fact by the District Court are entitled to collateral estoppel or issue preclusion affect in this adversary proceeding if the other elements of the test are met.

The Court must next address the question of the extent of the identity of the issues that were tried by the District Court and those being tried in this adversary proceeding.

The Plaintiffs have prayed that the indebtedness to them by the Debtor arising out of the District Court judgment be held nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (4) and (6) which provide as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

\* \* \* \* \* \*

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

\* \* \* \* \* \*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

The Court must thus review the necessary elements to be proven by the Plaintiffs to prevail under §§ 523(a)(2)(A), (4) and (6) in order to determine whether the prior District Court judgment should be afforded collateral estoppel or issue preclusion effect in the case at bar.

 The statutory elements that need to be proven under § 523(a)(2), (4) and (6) and the federal case law construing the same will often not be the same as is necessary to assess liability in the state court or in a federal court based on state law based on the same set of facts. For instance, while a debtor may be liable in damages for a mere technical conversion in the state court, § 523(a)(6) expressly requires that such a conversion be both "willful and malicious" in order for a debt to be held nondischargeable. *Compare, Noble v. Moistner,* 180 Ind.App. 414, 388 N.E.2d 620, 621 (4th Dist.1979), where conversion is defined as the "appropriation of property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from his possession, under a claim and title inconsistent with the owner's."

The application of this state law definition is clearly not sufficient in a nondischargeability proceeding under § 523(a)(6) in which the claimant must show conjunctively that the actions of the debtor were "willful *and* malicious". Thus a mere technical conversion may be dischargeable in bankruptcy, where it is not shown the same was willful and malicious. *See, e.g., Matter of Conner,* 59 B.R. 594, 596 (Bankr.W.D.Mo.1986). *See also,* 3 *Collier on Bankruptcy,* para 523.16 (pp 511–514) (L. King 15th Ed.), where it discusses the fact that the 1978 Code overruled many previous Act cases holding various degrees of recklessness as being willful and malicious and that a deliberate and intentional act is necessary.

 The same can be said of a state fraud action. In Indiana, the claimant can prevail if he can prove that the fraud is either actual or constructive. Under Indiana law "constructive fraud" is fraud that arises by operation of law from con-

duct, which if sanctioned by law, would secure an unconscionable advantage. *Whiteco Properties, Inc. v. Thielbar*, 467 N.E.2d 433 (Ind.App. 3rd Dist.1984); *See also, Abdulrahim v. Gene B. Glick Co., Inc.*, 612 F.Supp. 256 (D.C.Ind.1985); *Crook v. Shearson Loeb Rhoades, Inc.*, 591 F.Supp. 40 (D.C.Ind.1983).

■ This is to be compared with the clear legislative intent of the provisions of § 523(a)(2)(A). The relevant legislative statements thereto are as follows:

[t]hus, under section 523(a)(2)(A) a creditor must prove that the debt was obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insiders financial condition. Subparagraph (A) is intended to codify current case law, e.g. *Neal v. Clark*, 95 U.S. 704 [24 L.Ed. 586] (1887) [ (1877) ], which interprets "fraud" to mean actual or positive fraud rather than fraud implied in law. Subparagraph (A) is mutually exclusive from subparagraph (B). Subparagraph (B) pertains to the so-called false financial statement....

124 Cong.Rec. H11095–96 (Daily Ed. Sept. 28, 1978); S17412 (Daily Ed. Oct. 6, 1978). Reprinted in 4 *Norton Bankruptcy Law and Practice*, Annotated Legislative History, § 523, page 397 (Callaghan and Company, 1983).

The Courts have consistently held in construing § 523(a)(2)(A) that there must be proof of positive fraud and this involves showing that the acts which constitute fraud involved moral turpitude or an intentional wrong; and fraud implied in law which does not require a showing of bad faith or immorality is insufficient. *See e.g., In re Gilman*, 31 B.R. 927, 929 (Bankr.S.D. Fla.1983); *In re Slutzky*, 22 B.R. 270, 271 (Bankr.E.d.Mich.1982); *In re Montbleau*, 13 B.R. 47, 48 (Bankr.D.Mass.1981); *In re Byrd*, 9 B.R. 357, 359 (Bankr.D.C.1981); *In re McAdams*, 11 B.R. 153, 155 (Bankr.D.Vt. 1980).

Thus, from the mere fact that a fraud, conversion, or breach of fiduciary duty case is fully tried on its merits and judgment entered based on state law, it does not follow that the Court's findings of fact in such a case (assuming that Court used the clear and convincing evidence standard discussed above) would have the effect of collateral estoppel or issue preclusion in a subsequent nondischargeability proceeding in the Bankruptcy Court as for example, the evidence might show, that although the court found fraud the finding of fraud may have really been a finding of constructive fraud or fraud implied-in-law as opposed to actual or positive fraud or that the finding of conversion was really based on a technical conversion or gross negligence which would be dischargeable in the bankruptcy proceeding.

The Court will now review the elements of each section of 523 relied upon by the Plaintiff.

### 11 U.S.C. § 523(a)(2)(A)

The Seventh Circuit in *Matter of Pappas*, 661 F.2d 82 (7th Cir.1981), a case interpreting the predecessor to 11 U.S.C. § 523(a)(2) (11 U.S.C. § 35(a)(2)), held the bankruptcy court had exclusive jurisdiction to determine the meaning of false pretenses and false representations without having to look at Indiana state law. There have been only slight changes between 11 U.S.C. § 35(a)(2) and the present 11 U.S.C. § 523(a)(2) and thus the foregoing principle as to applicable law in a fraud case set out in *Pappas* remains a correct statement of the law under the 1978 Code. *See Birmingham Trust National Bank v. Case*, 755 F.2d 1474, (11th Cir.1985), where it was held that because of negligible differences, case law under the Act serves as a useful guide under the 1978 Code.

The cases construing the 1978 Code are consistent with the Act case of *Pappas*, and hold that the question of whether a debt is dischargeable is one of federal law. *In re Marini*, 28 B.R. 262, 264 (Bankr.E.D. N.Y.1983); *In re Tapp*, 16 B.R. 315, 318 (Bankr.D.Alaska 1981); *In re Sadwin*, 15 B.R. 884, 886 (D.Ct.M.D.Fla.1981); *In re Liberati*, 11 B.R. 54 (Bankr.E.D.Penn. 1981).

The basic elements of the Plaintiff's claim which must be proved by clear and

convincing evidence pursuant to 11 U.S.C. § 523(a)(2)(A) are as follows:

1. That the debtor obtained the money (property or services) through representations which the debtor either knew to be false or made with such reckless disregard for the truth as constitutes a willful misrepresentation;

2. That the debtor possessed scienter, i.e. an intent to deceive; and

3. That the creditor relied on the false representation and the reliance was reasonable.

*In re Kimzey*, 761 F.2d 421, 423 *supra.*

In construing the scienter element under the Bankruptcy Act's counterpart to § 523(a)(2)(A) (§ 17(a)(2)), the Seventh Circuit in the case of *Carini v. Matera*, 592 F.2d 378 (7th Cir.1979) held that for a debt to be nondischargeable the bankrupt must have obtained the money or property through representations known to be false or *made with reckless disregard for the truth amounting to willful misrepresentations, citing In re Houtman*, 568 F.2d 651, 655–56 (9th Cir.1978). The *Houtman* court cited the Supreme Court opinion of *Morimura Arai & Company v. Taback*, 279 U.S. 24, 49 S.Ct. 212, 73 L.Ed. 586 (1929) for its decision. In *Morimura*, the court held that "reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct" was sufficient to establish the knowledge element under a provision of the Bankruptcy Act, then in existence which completely barred a discharge of all debts if the bankrupt had made a materially false statement in order to obtain property or credit. *Id.* 279 U.S. at 33, 49 S.Ct. at 215. The *Houtman* court went on to add that the close statutory relationship between the concept of that act and § 17(a)(2) suggests that a similar definition of knowledge would be appropriate.

▉ Also, as to the scienter element, an intent to deceive may logically be inferred from a false representation which the debtor knows or should know will in-duce another to make a loan (or otherwise part with property or services). *In re Kimzey*, 761 F.2d 424, *supra.* Also, because direct proof of reliance is difficult, actual reliance may be proven by circumstantial evidence of reliance. *In re Kreps*, 700 F.2d 372, 375, *supra.* The actual reliance must be reasonable. The Seventh Circuit has held that the reliance test is not meant to "second guess a creditor's decisions to make a loan or set loan policy for a creditor". *Matter of Garman*, 625 F.2d 755, 759 (7th Cir.1980), *cert. denied sub nom. Garman v. Northern Trust Co.*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). In addition, the Court is not empowered to "undertake a subjective evaluation and judgment of a creditor's lending policies and practices". *Id.* at 759.

It is important to note the legislative history to 11 U.S.C. § 523(a)(2)(A). The relevant portion of the Senate Report is as follows:

> Paragraph (2) provides that as under Bankruptcy Act section 17a(2), a debt for obtaining money, property, services, or a refinancing extension or renewal of credit by false pretenses, a false representation, or actual fraud, or by use of a statement in writing respecting the debtor's financial condition that is materially false, on which the creditor reasonably relied, and which the debtor made or published with intent to deceive, is excepted from discharge. This provision is modified only slightly from current section 17a(2). First, "actual fraud" is added as a ground for exception from discharge.

Senate Report No. 95–595, 95th Cong., 2nd Sess. 78–79 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5864. reprinted in 4 *Norton Bankruptcy Law and Practice*, Annotated Legislative History, § 523, page 396 (Callaghan and Company, 1983).

The relevant legislative statements are as follows:

> [t]hus, under section 523(a)(2)(A) a creditor must prove that the debt was obtained by false pretenses, a false representation, or actual fraud, other than a

statement respecting the debtor's or an insiders financial condition. Subparagraph (A) is intended to codify current case law e.g., Neal v. Clark, 95 U.S. 704 (1887), which interprets "fraud" to mean actual or positive fraud rather than fraud implied in law. Subparagraph (A) is mutually exclusive from subparagraph (B). Subparagraph (B) pertains to the so-called false financial statement. . . . 124 Cong.Rec. H11095–96 (Daily Ed. Sept. 28, 1978); S17412 (Daily Ed. Oct. 6, 1978). Reprinted in 4 *Norton Bankruptcy Law and Practice*, Annotated Legislative History, § 523, page 397 (Callaghan and Company, 1983).

 Thus, there must be proof of positive fraud and this involves showing that the acts which constitute fraud involved moral turpitude or an intentional wrong; and fraud implied in law which does not require a showing of bad faith or immorality is sufficient. *In re Gilman*, 31 B.R. 927, 929 *supra; In re Slutzky*, 22 B.R. 270, 271 *supra: In re Montbleau*, 13 B.R. 47, 48 *supra; In re Byrd*, 9 B.R. 357, 359 *supra; In re McAdams*, 11 B.R. 153, 155 *supra.* Therefore, a mere breach of contract by the debtor without more, does not imply existence of actual fraud for purposes of the exception to discharge under § 523(a)(2)(A). *In re Emery*, 52 B.R. 68, 70 (Bankr.E.D.Pa.1985). Accordingly, a mere promise to be executed in the future is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach. *In re Barker*, 14 B.R. 852, 567 (Bankr.E.D.Tenn.1981). *See also*, 3 *Collier on Bankruptcy*, para. 523.08, p. 523–47 (L. King 15th Ed.). That is, subsequent conduct contrary to a former representation does not necessarily render the original representation to be false. *In re Boese*, 8 B.R. 660, 662 (Bankr. D.N.Dak.1981). However, if a debtor enters into a contract intending not to comply with its terms and later defaults under that contract, such contract may provide a basis for exceptions to discharge on the grounds of fraud *if the other remaining elements are satisfied, In re Taylor*, 49 B.R. 849, 851 (Bankr.E.D.Pa.1985); *In re Fenninger*, 49 B.R. 307, 310 (Bankr.E.D.Pa.1985).

 "Actual" fraud precluding discharge consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another; something said, done or omitted with the design of perpetrating what is known to be a cheat or deception. *In re Davis*, 11 B.R. 156, 158 (Bankr.D.Vt. 1980). However, fraud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact. *In re Slutzky*, 22 B.R. 270, 272 *supra; In re Frye*, 48 B.R. 422, 426 (Bankr.M.D.Ala. 1985); *In re Samford*, 39 B.R. 423, 427 (Bankr.M.D.Tenn.1984); *Matter of Weinstein*, 31 B.R. 804, 809 (Bankr.E.D.N.Y. 1983).

 A "false pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation. *Matter of Weinstein*, 31 B.R. at 809, *supra.*

 This finding of fact as to the Defendants' fraudulent intention or scienter will obviously have to be determined by circumstantial evidence in most cases as direct evidence of the Defendants' state of mind at the time of the transaction is seldom expressly indicated. Although this is certainly a difficult task, it is no greater a task than any other cause of action that includes intent or state of mind as a necessary element, and the existence of fraud may be inferred if the totality of the circumstances present a picture of deceptive conduct by the debtor which indicates he intended to deceive or cheat the creditor. *In re Fenninger*, 49 B.R. 307, 310, *supra; In re Taylor*, 49 B.R. 849, 851, *supra.* The Court may logically infer an intent not to pay from the relevant facts surrounding each particular case. *See In re Kimzey*, 761 F.2d 421, 424, *supra.* And a person's intent, his state of mind, has been long recognized as capable of ascertainment and a statement of present intention is deemed a statement of a material existing fact sufficient to support a fraud action. *In re*

*Pannell,* 27 B.R. 298, 302 (Bankr.E.D.N.Y. 1983). While as a general proposition the alleged fraud must exist at the inception of the debt, and statements or actions which were neither false nor fraudulent when made will not be made so by the happening of subsequent events, a promisor's *subsequent conduct may reflect his state of mind at the time he made the promise* and thus be considered in determining whether he possessed the requisite fraudulent intent. *In re Kelsey,* 9 B.R. 154, 157 (Bankr.W.D.Ky.1981). Nevertheless, false representations or false statements encompass statements that falsely purport to depict *current or past facts* and do not relate to *future action. In re Todd,* 34 B.R. 633, 635 (Bankr.W.D.Ky.1983).

■■■■ To except a debt for property, services or credit from discharge, the property, services or credit must have actually been obtained by the debtor from the creditor as a direct result of the fraud. Expressed another way, a creditor must have given present consideration based on the false pretense, false representation or actual fraud. Thus, for example, a debt which is otherwise dischargeable does not become nondischargeable on the grounds of fraud because the debtor attempted to pay a check that was subsequently dishonored where the creditor sustains no loss by reason of the issuance of the check. *In re Preston,* 47 B.R. 354, 357 (Bankr.E.D.Va. 1983). *See also,* 3 *Collier on Bankruptcy,* para. 523.08(1), p. 523–39 (L. King 15th Ed.1986).

In reviewing the findings of fact and conclusions of law made by the District Court, the Court applied the elements of common law fraud as applicable in the state of Indiana and as set out in the case of *Tutwiler v. Snodgrass,* 428 N.E.2d 1291 (Ind.App.1981). The *Tutwiler* case sets out the elements necessary to prove actual or positive fraud necessary to prevail pursuant to § 523(a)(2)(A) rather than the elements of constructive fraud or fraud implied in law which would not suffice. That is, the elements set out in *Tutwiler* in essence track those discussed by the Seventh Circuit in *In re Kimzey,* 761 F.2d 423, *supra.*

■■ The district Court clearly held that the Plaintiff had proved fraud by clear and convincing evidence as to at least the Plaintiff McClinchy Wagner in that the debtor misrepresented the worth of the stock sold to her. As to whether the Debtor's conduct constituted fraud within the purview of § 523(a)(2)(A) as to the remaining Plaintiffs is not so clear. The parties did stipulate that the Debtor made "misleading oral reports to the Plaintiffs, upon which they relied to their detriment." It is not clear at all from the record whether these misleading oral reports were indeed material and done with the necessary scienter as to the other Plaintiffs, which were reasonably relied upon to constitute fraud pursuant to § 523(a)(2)(A).

### 11 U.S.C. § 523(a)(6)

The legislative history to this provision must be carefully scrutinized regarding this provision. The House Report is as follows:

> Paragraph (6) excepts debts for willful injury by the debtor to another person or to the property of another person. Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell,* 193 U.S. 473 (1902) [24 S.Ct. 505, 48 L.Ed. 754, 11 Am.Bankr.Rep. 568], held that a looser standard is intended, and to the extent that other cases have relied on Tinker to apply a "reckless disregard" standard, they are overruled.

H.R.Rep. 95–595, 95th Cong., 1st Sess. 365 (1977), U.S.Code Cong. & Admin.News 1978, pp. 6320–6321; *Reprinted* in 4 *Norton Bankruptcy Law and Practice, Legislative History,* § 523, p. 404 (Callaghan & Co. 1983).

The legislative statements to this section add the following comment:

> Section 523(a)(6) adopts the position taken in the House bill and rejects the alternative suggested in the Senate amendment. The phrase "willful and malicious injury" covers a willful and malicious conversion.

124 Cong.Rec., H11096 (Daily Ed. Sept. 28, 1978); S17412 (Daily Ed. Oct. 6, 1978); Reprinted in 4 *Norton Bankruptcy Law and Practice, Legislative History*, § 523, p. 404–405 (Callaghan & Co. 1983).

■ The legislative history of the Bankruptcy Code thus reflects that Congress clearly intended a standard of intentional and deliberate conduct and not merely a willful disregard or reckless conduct.

The Supreme Court in *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), provided a definition of "malicious injury". *Tinker* involved a state court action against a bankrupt for damages arising from criminal conversation with the plaintiff's wife. At issue was whether the bankrupt's acts were willful and malicious injury to the plaintiff's property rights and thus nondischargeable under § 17(a)(2) of the Bankruptcy Act of 1898.[1]

The Supreme Court in *Tinker* for the purposes of Section 17(a)(2) concluded:

> [W]e think a willful disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception.

*Id.* 193 U.S. at 487, 24 S.Ct. at 509, 48 L.Ed. 754.

*Collier on Bankruptcy* has made a helpful analysis of § 523(a)(6) as follows:

> In order to fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite or ill-will. The word "willful" means "deliberate or intentional," a deliberate and intentional act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious

injury. It has been said that this category of liabilities excepted from discharge "contemplates something more restricted than malice in the broader sense," and covers all cases in which the facts of intent and malice are judicially ascertained, irrespective of the character of the allegations made by the parties. Injuries within the meaning of the exception are not confined to physical damage or destruction; but an injury to intangible personal or property rights is sufficient. *Thus the conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is willful and malicious injury within the meaning of the exception. On the other hand; a technical conversion may very well lack any element of willfulness or maliciousness necessary to except the liability from discharge.*

> A claim or judgment based merely upon negligence does not necessarily constitute a willful and malicious injury within the exception even if the negligence is alleged to be reckless and wanton. Under this paragraph, "willful" means deliberate or intentional. Cases decided under section 17a(2) of the former Bankruptcy Act, such as *Tinker v. Colwell* holding that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled. In *Greenfield v. Tuccillo*, [129 F.2d 854 (2nd Cir.1942)] the Second Circuit Court of Appeals said, citing *Tinker*:

> "The question is whether the liability to Greenfield was for 'willful and malicious' injuries. Such injuries have been defined by the Supreme Court as arising from an act involving a 'willful disregard of what one know to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally.' *Tinker v. Colwell*, 193 U.S. 473, 487, [24 S.Ct. 505, 509,] 11 AM.B.R. 568. *See McIntyre v.*

---

1. *See* 11 U.S.C. § 35(a)(2), repealed 1978. Section 17(a)(2) is the predecessor provision under the Bankruptcy Act of 1898 to § 523(a)(6) of the Code.

*Kavanaugh,* 242 U.S. 138, [37 S.Ct. 38, 61 L.Ed.2d 205,] 38 AM.B.R. 165; *Brown v. Garey,* 28 AM.B.R. (N.S.) 270, 267 N.Y. 167, 169 [196 N.E. 12, 14]...."

It is clear from both the House and Senate Reports that the standard of "reckless disregard" as expressed in *Greenfield* will no longer be applicable, and the many cases holding various degrees of recklessness to constitute willfulness and maliciousness will no longer be controlling in construing section 523(a)(6) of the Code.

3 *Collier on Bankruptcy,* para. 523.16 (pp. 511–14) (L. King 15th Ed.) (Footnotes omitted) (Emphasis added).

The formulation and application of a precise definition of "willful and malicious" to be applied generally has been a difficult one for the courts.

The definition of "willful" has given the courts the least problem, and most Courts have followed the legislative history and have held that "willful" means a deliberate or intentional act. *See In re Adams,* 761 F.2d 1422, 1426 (9th Cir.1985); *In re Clark,* 50 B.R. 122, 126 (Bankr.D.N.Dak.1985); *In re Nuckols,* 47 B.R. 731, 734 (Bankr.E.D. Va.1985); *In re Langer,* 12 B.R. 957, 959 (Bankr.D.N.Dak.1981).

Thus "willful and malicious" does not mean reckless disregard or mere negligence. *In re Compos,* 768 F.2d 1155, 1157 (10th Cir.1985); *In re Louis,* 49 B.R. 135, 137 (Bankr.E.D.Wis.1985); *In re Nuckols,* 47 B.R. 731, 734, *supra; Matter of Vereen,* 43 B.R. 489, 491 (Bankr.M.D. Fla.1984). Even gross negligence is not sufficient. *In re Louis,* 49 B.R. 135, 137 (Bankr.E.D.Wis.1985). An increase in the degree of gross negligence only increases the possibility of resulting injury, it does not make the injury willful. *In re Morgan,* 22 B.R. 38, 39 (Bankr.D.Neb.1982).

However, as pointed out by the court in the recent case of *In re Cecchini,* 780 F.2d 1440, 1442 (9th Cir.1986), the courts are split over the interpretation of the phrase "willful and malicious" even though the act must be found to be inten-

tional. The word "malicious" is less susceptible to precise definition and has always been a difficult concept for the courts to apply. That is, as *Cecchini* points out, some courts have found this phrase requires an intentional act which *results* in injury, *see e.g., In re DeRosa,* 20 B.R. 307, 313 (Bankr.S.D.N.Y.1982); *In re Fussell,* 15 B.R. 1016, 1022 (Bankr.W.D.Va.1981); *In re McGiboney,* 8 B.R. 987, 989 (Bankr. N.D.Ala.1981), while other courts have found that phrase requires an act with the *intent* to cause injury. *See e.g., In re Graham,* 7 B.R. 5 (Bankr.D.Nev.1980); *In re Finnie,* 10 B.R. 262, 264 (Bankr.D.Mass. 1981); *In re Hinkle,* 9 B.R. 283, 286 (Bankr.D.Mass.1981).

The plaintiff in *Cecchini* urged that the looser standard of "willful and malicious" refers to an intentional act which causes injury. Under this construction the creditor would not be required to prove that the debtor acted with intent to injure. The *Cecchini* court noted that the plaintiff's construction was in accord with other circuits that recently addressed the matter. *Cecchini,* 780 F.2d at 1442, *citing In re Franklin,* 726 F.2d 606, 610 (10th Cir. 1984); *In re Held,* 734 F.2d 628, 629–30 (11th Cir.1984); *Matter of Quezada,* 718 F.2d 121, 123 (5th Cir.1983); *Seven Elves Inc. v. Eskenazi,* 704 F.2d 241, 245 (5th Cir.1983). *See also, In re Adams,* 761 F.2d 1422, 1427, *supra.* There the court rejected the appellant's contention that the requirements of willfulness and malice could only be satisfied by a showing that he specifically intended to injure the appellee.

Accordingly, *Cecchini* holds that when a wrongful act, such as conversion is done intentionally, necessarily produces harm, and is without just cause or excuse, it is "willful and malicious" even absent proof of specific intent to injure.

Thus, one line of cases is that malice may exist by implication or constructively because the debtor's actions indicate he knew that his actions would result in injury but acted in disregard of that knowledge. *See e.g., United Bank of Southgate v. Nelson,* 35 B.R. 766, 768 (N.D.Ill.1983); *In re Clark,* 50 B.R. 122, 126, *supra; In re*

*Lindberg,* 49 B.R. 228, 230 (Bankr.D.Mass. 1985); *In re Frye,* 48 B.R. 422, 427 (Bankr. M.D.Ala.1985); *In re Wolfington,* 47 B.R. 225, 226 (E.D.Pa.1985).

The other line of cases hold that malice cannot exist constructively or by implication, but must be evidenced by specific intent to injure a person or his property. *See e.g., In the Matter of Ireland,* 49 B.R. 269, 271 (Bankr.W.D.Mo.1985); *In re Gallaudet, III,* 46 B.R. 918, 925 (Bankr.D.Vt. 1985); *In re Major,* 44 B.R. 636, 639 (Bankr.W.D.Mo.1984).

The court in *United Bank of Southgate v. Nelson,* 35 B.R. 766, 769, *supra,* noted in finding that "malicious" only requires a finding of implied or constructive malice and that Congress, in overruling *Tinker,* meant to only modify *Tinker's* definition of "willful" and to retain the definition of "malicious" as developed by that decision. This Court also notes the specific intent requirement has been sharply criticized for placing an almost insurmountable burden on the creditor. This is particularly true in the area of conversion as most conversions of property are made to reduce financial strain and reduce expenses rather than to injure the creditor's interest specifically. *See* Comment, *Accidental "Willful and Malicious Injury": The Intoxicated Driver and Section 523(a)(6),* 1 Bank.Dev.J. 135, 141 (1984).

This Court adopts the reasoning of *Cecchini* and *United Bank of Southgate,* and holds "willful" and "malicious" to be an intentional or deliberate wrongful act, done without excuse or just cause, which produces or results in harm or injury and that the wrongdoer need not have a specific intent to cause the resulting harm or injury to the person and property of the plaintiff. It is the intent to do the act which is the operative legal event and not the intent to do the harm. *In re Nuckols,* 47 B.R. 731, 735, *supra.*

Thus, the phrase "willful and malicious" under 11 U.S.C. § 523(a)(6) does not connote or require personal hatred, ill-will, spite or special malice. *In re Salai,* 50 B.R. 11, 12 (Bankr.Fla.1985); *In re Dever,* 49 B.R. 329, 332 (Bankr.Ky.1984); *In re*

*Friedenberg,* 12 B.R. 901, 905 (Bankr.S.D. N.Y.1981). However, mere failure to perform and contractual obligations, standing alone, does not make a debt non-dischargeable under 11 U.S.C. § 523(a)(6); *In re Salett,* 53 B.R. 925, 930 (Bankr.D.Mass. 1985); *In re Schaeffer,* 30 B.R. 301, 303 (Bankr.S.D.Ohio 1983).

The District Court made express findings of fact based upon the clear and convincing evidence standard of proof that the Debtor converted the following partnership funds:

1. $1,500.00 was wrongfully used by the Debtor to defend the suit by the Plaintiffs. (Findings of Fact no. 20).

2. $2,333.78 was wrongfully converted by the Debtor for his own personal use. (Findings of Fact no. 21).

3. $4,000.00 was wrongfully converted by the Debtor by having monies paid to another fund in which the Plaintiffs had no interest. (Findings of Fact no. 22).

4. $7,833.78 was withdrawn from the partnership account and used by the Debtor for his own personal benefit. (Findings of Fact no. 23).

The foregoing totals $15,667.56.

These sums were clearly converted by the Debtor to his own use. The District Court expressly found that the Debtor's liability did not arise out of a "good faith" contract dispute as discussed by the Court in *First Federal Savings and Loan Association of Indianapolis v. Mudgett,* 397 N.E.2d 1002 (Ind.App.1979), but that the Debtor's conduct involved economic duress as recognized in *Vernon Fire and Casualty Ins. Co. v. Sharp,* 264 Ind. 599, 349 N.E.2d 173 (1976).

Although duress alone does not also necessarily constitute conversion under § 523(a)(6), the District Court expressly held that the test set forth in *Travelers* had been met in that the evidence was inconsistent with the hypothesis that the tortious conduct was the result a "mistake of law or fact, honest error of judgment, over zealousness, mere negligence or other noniniquitous human failing. *Id.* at 442. In addition, the findings of fact 20 through 23

expressly find wrongful conversion or use by the Debtor. Thus, the Debtor is collaterally estopped by the findings of the District Court that the Debtor wrongfully converted $15,667.56 in partnership funds to his own use in violation of § 523(a)(6).

### 11 U.S.C. § 523(a)(4)

It has been consistently held that the scope of the concept "fiduciary" under this exception to discharge provision is a question of federal law. *See Matter of Rausch,* 49 B.R. 562 (Bankr.D.N.J.1985); *In re Schultz,* 46 B.R. 880 (Bankr.D.Nev.1985); *In re Adkisson,* 26 B.R. 879 (Bankr.E.D. Tenn.1983); *Matter of Angell,* 610 F.2d 1335 (5th Cir.1980); *In re Paley,* 8 B.R. 466, (Bankr.E.D.N.Y.1981).

However, state law is important in determining when a trust relationship exists. That is, in determining whether a requisite trust exists, the Court should consult state law although the issue ultimately remains a federal question. *In re Niven,* 32 B.R. 354 (Bankr.W.D.Okla.1983); *In re Ballard,* 26 B.R. 981 (Bankr.D.Conn.1983); *Matter of Murphy,* 9 B.R. 167 (Bankr.Va.1981); *In re Schultz,* 46 B.R. 880, (Bankr.D.Nev. 1985).

The broad, general definition of fiduciary, involving confidence, trust and good faith, is inapplicable in a dischargeability context, thus excluding ordinary commercial relationships from the reach of the section of the Bankruptcy Code excepting from discharge certain debts incurred in a fiduciary capacity. *In re Schultz,* 46 B.R. 880, *supra.*

It has been repeatedly held that a debtor is not a fiduciary within the meaning of 11 U.S.C. § 523(a)(4) in the absence of any evidence that an express or technical trust existed between the debtor and the creditor. *In re Ballard,* 26 B.R. 981, *supra; In re Lowther,* 32 B.R. 638 (Bankr.W.D.Okla. 1983); *In re Baiata,* 12 B.R. 813 (Bankr.E. D.N.Y.1981).

However, when a state statute imposes trust-like obligations on parties engaging in certain kinds of contracts the contracting parties may be trustees for purposes of 11 U.S.C. § 523(a)(4). *See In re Bacher,* 47 B.R. 825 (Bankr.E.D.Pa. 1985); *In re Gagliano,* 44 B.R. 259 (Bankr. N.D.Ill.1984).

Based on the foregoing requirements it has also been consistently held that constructive trusts, or those implied by law, that created duties *ex maleficio,* are not the types of fiduciary relationships that fall under 11 U.S.C. § 523(a)(4). *See In re Talcott,* 29 B.R. 874 (Bankr.D.Ka.1983); *In re Ayers,* 25 B.R. 762 (Bankr.M.D.Tenn.1982); *In re Barwick,* 24 B.R. 703 (Bankr.E.D.Va. 1982); *In re Ridgway,* 24 B.R. 780 (Bankr. D.Kan.1982); *Matter of Wise,* 6 B.R. 867 (Bankr.M.D.Fla.1980).

What the foregoing cases are saying is that since an express or technical trust is required the fiduciary relationship must be shown to have existed *prior* to the creation of the debt in controversy. *Matter of Thomas,* 21 B.R. 553 (Bankr.E.D. Wis.1982), *aff'd.* 34 B.R. 103; *In re Gagliano,* 44 B.R. 259, *supra.* That is, the Plaintiff must show the Debtor was a trustee *before* the wrong occurred, without any reference to the wrong and be independent of it. *Matter of Wise,* 6 B.R. 867, *supra; In re Marshall,* 24 B.R. 105 (Bankr.W.D.Mo.1982).

Absent statutory definition or special considerations, ordinary commercial relationships such as principal and agent do not fall within the meaning of fiduciary under the Bankruptcy Code, *In re Ridgway,* 24 B.r. 780, 785, *supra; In re Paley,* 8 B.R. 466, *supra.* This is also true of one who holds the status of a bailee, without more. *In re Holman,* 42 B.R. 848 (Bankr. E.D.Mo.1984); *Matter of Adams,* 24 B.R. 252 (Bankr.W.D.Mo.1982).

Even the fact that a commercial agreement contains the word "trust" does not make the agreement a trust agreement nor create a fiduciary relationship for non-dischargeability purposes, but it is the substance and character of the debt relationship and not its form that determines whether fiduciary relationship exists. *See In re Gallaudet,* 46 B.R. 918 (Bankr.D.Vt.

1985); *In re Talcott*, 29 B.R. 874 (Bankr.D. Kan.1983); *In re Paley*, 8 B.R. 466, *supra.*

Thus, mere contract jargon is not determinative of the existence of a fiduciary relationship and the determinative causes are whether there was an effective duty to segregate funds, an insistence on segregation of funds, formality of relationship and requirement of an accounting. *Matter of Storms*, 28 B.R. 761 (Bankr.E.D. N.C.1983).

A review of the following cases all consistently indicate that an ordinary commercial agreement, although it may contain certain elements of trust and confidence, is not sufficient standing alone to establish an express or technical trust.

For example, it was held in *In re Snellgrove*, 15 B.R. 149 (Bankr.S.D.Fla.1981), that where debtors who were president and general contractor, diverted funds from a certain construction project to other construction projects they were not acting in a fiduciary capacity.

And a floor plan financing arrangement between a dealer and a creditor does not normally give rise to a trust relationship as to preclude discharge. *In re Talcott*, 29 B.R. 874 (Bankr.D.Kan.1983); *Accord: In re Gallaudet*, 46 B.R. 918 (Bankr.D.Vt. 1985); *In re Hickey*, 41 B.R. 601 (Bankr.S. D.Fla.1984); *In re Clifton*, 32 B.R. 666 (Bankr.D.N.M.1983); *Matter of Chambers*, 23 B.R. 206 (Bankr.Wis.1982); *In re Miles*, 5 B.R. 458 (Bankr.E.D.Va.1980).

A debtor who managed creditor's property was merely a typical agency relationship where there was no express technical trust agreement between debtor and creditor. *In re Ridgway*, 24 B.R. 780 (Bankr.D.Kan. 1982).

An agreement between Airline Ticket Associations and debtors who conducted a travel service and who did not turn over proceeds of sale per agreement between the parties did not create a fiduciary relationship when agreement appeared to be no more than ordinary commercial contract and the agreement did not require debtors to segregate funds. *In re Paley*, 8 B.R. 466, *supra. See also, In re Chick*, 53 B.R. 697 (Bankr.D.Ore.1985), where although the agreement had boiler-plate language evidencing a trust agreement, there was no specific requirement to segregate funds no fiduciary relationship was established.

An insurance agent's indebtedness for premiums did not create a fiduciary capacity, embezzlement or fraud when though the agency contract provided premiums were to be held in trust, the agent was not required to segregate the funds in a separate bank account and periodically account for premium collections. *Matter of Storms*, 28 B.R. 761, *supra.*

The mere fact a contractor-debtor told creditor he would pay an unpaid supplier did not create a fiduciary relationship but a mere debtor-creditor relationship. *In re Boese*, 8 B.R. 660 (Bankr.D.S.Dak.1981).

Thus, the Debtor's liability as a fiduciary under § 523(a)(4) will be determined by an analysis of the Sussex Vampire Fund Agreement of Limited Partnership and the rights and duties of the parties arising out of the contractual, statutory and common law relationships established between the Debtor, as a general partner and the Plaintiffs as limited partners.

The Plaintiff's in their Memorandum in Support of their Motion for Summary Judgment filed April 24, 1986 at p. 6 assert that they are relying primarily on 11 U.S.C. § 523(a)(4).

In support of their position the Plaintiffs cite the case of *In re Niven*, 32 B.R. 354, *supra*, where the Court stated:

"Defalcation" has been defined as "the failure of one who has received monies in trust to pay it over as he ought. It is a broader word than fraud, embezzlement or misappropriation, and covers cases where there was no fraud, embezzlement, or willful misappropriation on the part of the bankrupt." *In re Herbst*, 22 F.Supp. 353, 354 (S.D.N.Y.1937). In affirming the ruling of the district court, Judge Learned Hand, in *Central Hanover Bank and Trust Co. v. Herbst*, 93 F.2d 510 (2nd Cir.1937), noted that, although colloquially, the word "defalcation" ordinarily implies some moral dere-

liction, in a bankruptcy context it may include innocent default, including all fiduciaries, who for any reason were short in their accounts. "[W]hen a fiduciary takes money upon a conditional authority which may be revoked and knows at the time that it may, he is guilty of 'defalcation' though it may not be a 'fraud', or an 'embezzlement', or perhaps not even a 'misappropriation'." *Id.* at 512.

The case of *John P. Maguire and Co. v. Herzog*, 421 F.2d 419 (5th Cir.1970) is somewhat analogous to the case at bar. *Herzog* was decided under § 17a(4) of the Bankruptcy Act which created an exception to discharge for debts created by the debtor's fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity. The Court in *Herzog* resolved the matter by a determination that the debtor committed a misappropriation while an officer. Paragraph 4 of § 523(a) of the Bankruptcy Code omits the word "officer". "But the omission is without significance because an officer who misappropriates funds of a corporation is acting in a fiduciary capacity, and despite deletion of the word 'officer', the debt would be nondischargeable." 3 *Collier on Bankruptcy*, para. 523.14 n. 1 at 523–94 (15th ed.1979) (citation omitted). As we have already noted, a "defalcation" is much broader a term than "misappropriation" and therefore *Herzog* may be utilized in supplying a standard for committing a "defalcation". The Court in *Herzog* found that a corporate officer's application of proceeds, derived from the sale of goods acquired under a floorplan arrangement, prior to the bankruptcy of the corporation, which were to be held by the corporation for the creditor and then remitted on a periodic basis, and were instead applied to the debts of other creditors, constituted a debt created by "misappropriation" so as to bar its discharge when the officer was personally adjudged a bankrupt.

Accordingly, it is our opinion that Debtors committed a "defalcation".

A finding of "defalcation" does not, however, end the matter for in order to effect a complete resolution, we must address the second prong of our inquiry, namely, whether the defalcation was committed while acting in a "fiduciary capacity".

"Fiduciary capacity" as used in § 523, *supra*, has been held to connote the idea of trust or confidence, which relationship arises whenever one's property is placed in the custody of another. *In re Romero*, 535 F.2d 618 (10th Cir.1976). Furthermore, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Romero*, *supra*.

The fiduciary relationship referred to in § 523(a)(4) has been held to be limited to express and technical trusts. *Davis v. Aetna Acceptance Co.*, *supra*; *In re Romero*, *supra*; *In re Cairone*, 12 B.R. 60 (Bkrtcy.D.R.I.1981). Further, it has been held the trust may not be one arising or implied from a contract. *In re Romero*, *supra*. *Cf. Davis v. Aetna*, *supra*; *In re Paley*, 8 B.R. 466 (Bkrtcy. E.D.N.Y.1981) (it is not enough that the trust relationship spring from the act from which the debt arose). The fact that a commercial agreement contains the word "trust", however, does not make the agreement a trust agreement. *Davis v. Aetna Acceptance Co.*, *supra*; *In re Paley*, *supra*. "in the absence of a true fiduciary or trust relationship, a plaintiff may not circumvent the effect of a bankruptcy discharge by adding 'trust language' to an ordinary commercial agreement." *In re Paley*, *supra*, at 469.

The question of who is a fiduciary for purposes of § 523(a)(4) is one of federal law. *Matter of Angelle*, 610 F.2d 1335 (5th Cir.1980). However, state law plays an important role in determining whether a specific case involves an express trust. *Matter of Angelle*, *supra*; *In re Cairone*, *supra*. [12 B.R. 60 (Bkrtcy.D.R.I. 1981)]. *Cf. Jaffke v. Dunham*, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957) (determination of whether trust estab-

lished in bankruptcy proceeding under § 70(a)(4), 11 U.S.C. § 110(a)(4), is one of state Law).

*Id.* at 355–357.

The Court's attention is also directed to the case of *In re McCraney,* 63 B.R. 64 (Bankr.N.D.Ala.1986), where the Court in discussing the law to be applied in determining nondischargeability under § 523(a)(4) stated as follows:

All questions of dischargeability of debts in bankruptcy proceedings are federal law questions. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). Less clear is whether federal law or state law determines the underlying issues of a dischargeability issue under Section 523(a)(4).

The Supreme Court appeared to answer this question in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), by applying federal law. Some Courts of Appeals circumvent *Davis* and apply state law directly, but the majority of them apply *Davis* in connection with a non-*Davis* federal standards analysis of state law.

The Eleventh Circuit sides with the majority. *Matter of Cross,* 666 F.2d 873 (5th Cir.1982) (Unit B). *Cross* relies on *Matter of Angelle,* 610 F.2d 1335 (5th Cir.1980), which explains why both state and federal law should be consulted. "We think it essential to clarify the precise role of state law.... To begin with, the scope of the concept fiduciary under Section 17(a)(4) is a question of federal law." *Id.* 1341. "On the other hand, state law takes on importance in determining when a trust exists." *Id.* "We also believe that state law may play importance in determining whether a specific case involves an express trust." *Id.* Footnote omitted.

Under *Davis v. Aetna* and its progeny, a fiduciary relationship exists for purposes of the Bankruptcy Code if there is a technical trust, not one which the law implies from a contract, *Chapman v. Forsyth,* 2 How. 189, 195[, 11 L.Ed. 236] (1844); and it must have existed prior to the act creating the debt and without

reference to that act. *Upshur v. Briscoe,* 138 U.S. 365, 378, 11 S.Ct. 313, 317–18, 34 L.Ed. 931 (1890); and *Davis v. Aetna,* 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934).

Under *Cross* and the majority procedure, where state statutes impose fiduciary trusts, additional factors are considered. Does the statute require the individual to maintain a segregated account? *See Matter of Angelle,* 610 F.2d 1335, 1340 (5th Cir.1980); *Matter of Cross,* 666 F.2d 873, 881 (5th Cir.1982) (Unit B); *Matter of Banister,* 737 F.2d 225, 229 (2nd Cir.1984), *cert. denied,* [469] U.S. [1035], 105 S.Ct. 509, 83 L.Ed.2d 400 (1984); *In re Katzen,* 47 B.R. 738 (Bkrtcy.D.Mass.1985). Does the statue create the basic elements of a trust? Is a *res* defined? Are fiduciary duties spelled out? *In re Pedrazzini,* 644 F.2d 756, 759 (9th Cir.1981); and *In re Lipke,* 54 B.R. 704 (Bkrtcy.W.D.Wis. 1985).

*Id.* at 65–66 (Footnotes omitted).

The Seventh Circuit in the case of *Matter of Thomas,* 729 F.2d 502, applied federal standards to a Wisconsin statute without applying *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, *supra.*

The Plaintiff's assert that in looking to Indiana law under § 523(a)(4), the Uniform Partnership Act as adopted by the State of Indiana makes any partner accountable as a fiduciary *citing,* I.C. 23–4–1–21. However, the partnership in question is not a general partnership but a limited partnership and thus, I.C. 23–4–2–1 *et seq.* controls in the first instance.

Indiana Code 23–4–2–9 provides that a general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partnership without limited partners, except that, among other things, that without the written consent or ratification of the specific act by all limited partners, a general partner has no authority to possess partnership property, or assign their rights in specific partnership property for other than a partnership purpose. *Id.* at subsection (d).

Since a general partner of a limited partnership is subject to all the restrictions and liabilities of a partner that is not limited in nature by virtue of I.C. 23–4–2–9. I.C. 23–4–1–21(1) is applicable to an Indiana limited partnership and the general partner is thus a trustee of some type, either technical or *ex maleficio* after a wrong has been committed.

This section which is captioned "Partner accountable as a fiduciary", is identical to Section 21 of the Uniform Partnership Act, and provides as follows:

Sec. 21(1) Every partner must account to the partnership for any benefit, and hold as *trustee* for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property. (Emphasis added).

Indiana Code 23–4–1–20 places a duty on a partner to render on demand true and full information of all things affecting the partnership. Indiana Code 23–4–1–22 grants to any partner the right to a formal account as to partnership affairs. Indiana Code 23–4–2–10 gives the limited partner the same rights on a general partner to have on demand true and full information affecting the partnership, a formal account of partnership affairs, a right to a share of the profits, and the return of his contribution under certain circumstances.

In addition, pursuant to I.C. 23–4–2–29 in any case not provided for by the Indiana Limited Partnership Act, the rules of law, and equity, including, without limiting the generality thereof, statutory law, *common law*, and the law merchant shall govern. The Uniform Partnership Act was adopted by the state of Indiana in 1949, and thus any common law decisions as to the fiduciary nature of a partnership are still applicable pursuant to I.C. 23–4–2–29.

As discussed in 59A Am Jr.2d § 1333, *Partnership* it is clear as a general proposition that a general partner in a limited partnership is a fiduciary. There it is stated as follows:

Partners owe one another a duty of the utmost good faith, fairness, and loyalty. Their relationship is one of mutual trust and confidence and the law imposes upon them the highest standard of integrity and good faith in their dealings with each other. Thus general partners owe a fiduciary duty to limited partners, as a matter of law, especially since they have complete authority to deal with the partnership business. The sole general partner of a limited partnership owes to limited partners an even greater duty than that normally imposed on partners, especially when he holds a majority interest.

It has been said that the general partner, acting in complete control, stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of a trust, and that when breach of fiduciary duty is alleged the case is decided under the law of trusts. It has also been said that there is no basis for distinguishing the fiduciary relationship of corporate director and shareholder from that of general partner and limited partner. The principle is the same—those in control of the business must deal fairly with the interest of other investors. (Footnotes omitted).

As to the general partners' standard of conduct as a fiduciary it is stated at 59A Am.Jr.2d § 1335 *Partnerships*, as follows:

While a strict fiduciary standard is not the only measure which has been applied to the conduct of a general partner vis a vis his limited partners, it is the one most frequently encountered, and quite a few courts have applied to general partners in a limited partnership Cardozo's statement that "not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." When the question is one of the general partner's fiduciary duty, concepts of reasonableness and good faith have no application, so that, for instance, a sale by the partnership to the general partner or to a corporation owned by the general partner and her husband is unlawful, and whether it is in the best interest of the partnership is immaterial. The severity of a breach of fiduciary duty will not be

examined; the only question is whether there has been a breach at all. (Footnotes omitted).

In support of their position that the Defendant is a fiduciary for the purposes of 11 U.S.C. § 523(a)(4), the Plaintiff's in their brief cite *In re Kraus*, 37 B.R. 126 (Bankr. E.D.Mich.1984). The Court in *Kraus* after finding a partnership existed pursuant to Michigan law looked to M.C.L.A. § 449.21 which is identical to I.C. 23–4–1–21(1). The *Kraus* court concluded that the Uniform Partnership Act established an *express* trust for which each partner acts as a trustee, that the trust is created *before* the act creating the debt and without any reference to the debt. The *Kraus* court thus concluded that M.C.L.A. § 449.21 satisfied the test laid down in *In re Johnson*, 691 F.2d 249 (6th Cir.1982) (an act case interpreting former 11 U.S.C. § 35(a)(4)), which held as follows:

> The term "fiduciary" applies only to express or technical trusts, which are imposed on transactions by operation of law as a matter of equity. Moreover, the requisite trust relationship must exist prior to the act creating the debt and without reference to it. State statutes which impose a trust ex-maleficio are not within the scope of section 17(a)(4) since such trusts only arise upon an act of misappropriation.

*Id.* at 251–52 (Citations omitted).

The same result was reached in *In re Owens*, 54 B.R. 162 (Bankr.D.S.C.1984), in which the Court held that the Debtor, a general partner of a limited partnership, was obligated to the limited partners, and committed a defalcation while acting in a fiduciary capacity, *citing, In re Kraus*, 37 B.R. 126, *supra; In re Harris*, 458 F.Supp. 238 (D.Ore.1976, *aff'd.* 587 F.2d 451 (9th Cir.1978)). And in the recent case of *In re Dino*, 82 B.R. 184 (Bankr.D.R.I.1988), the Court concluded a partner is a fiduciary pursuant to § 523(a)(4), *citing, In re Owens, supra*, without discussion. *Compare, In re Taylor*, 58 B.R. 849 (Bankr.E.D.Va. 1986), and *In re Holman*, 42 B.R. 848 (Bankr.E.D.Mo.1984).

In *In re Taylor*, the Court concluded that the existence of a partnership does not *per se* create a fiduciary relationship within the meaning of 11 U.S.C. § 523(a)(4). 58 B.R. at 854. The *Taylor* Court found the reasoning in *Holman* to be persuasive. In *Holman*, the Court construed Section 358.-210 R.S.Mo. which is identical to I.C. 23–4–1–21(1), and expressly rejected the conclusion of the Court in *Kraus*. In so doing the *Taylor* Court stated as follows:

> The Michigan bankruptcy court in reaching this above-quoted conclusion, overlooks the old United States Supreme Court case of *Chapman v. Forsyth*, 2 How. 202, 43 U.S. 202, 11 L.Ed. 236 (1844). In that case, the Supreme Court first clarified the meaning of the term "fiduciary" as used in a bankruptcy statute similar to section 523(a)(4):
>
> > The second point is, whether a factor, who retains the money of his principal, is a fiduciary debtor within the act. If the act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act. The cases enumerated, "the defalcation of a public officer," "executor," "administrator," "guardian," or "trustee," are not cases of implied but special trusts, and the "other fiduciary capacity" mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act. This view is strengthened and, indeed, made conclusive by the provision of the fourth section, which declares that no "merchant, banker, factor, broker, underwriter, or marine insurer," shall

be entitled to a discharge, "who has not kept proper books of accounts." In answer to the second question, then, we say, that a factor who owes his principal money received on the sale of his goods, is not a fiduciary debtor within the meaning of the act.

*Chapman v. Forsyth, supra* 2 How. at p. 207.

This interpretation was later approved by the Supreme Court in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Clearly then, the term "fiduciary" as used in 11 U.S.C. 523(a)(4) is limited to the class of fiduciaries including trustees of specific written declarations of trust, guardians, administrators, executors, or public officers and, absent special considerations, does not extend to the more general class of fiduciaries such as agents, bailees, brokers, factors, and partners. Thus, the alleged indebtedness at issue in this case is not a debt for fraud or defalcation while acting in a fiduciary capacity.

*In re Taylor*, 58 B.R. at 851.

The Court in *In re Hurbace*, 61 B.R. 563 (Bankr.W.D.Tex.1986) construed Tex.Rev. Civ.Stat.Ann. Art. 6132b, § 21 (Vernon 1970), which is identical to I.C. 23-4-1-21(1), and stated as follows:

[t]he phrase "hold as trustee" does not establish a technical or express trust. Under the Texas statute, the trust arises only when the partner derives profits without the consent of the other partners. Therefore, the statute would fall within the ambit of a trust *ex maleficio* specifically excluded from the purview of nondischargeable 'debts under § 523(a)(4). *See Davis v. Aetna, supra.* The Source and Comments following the Texas statute reaffirm the nonapplicability of the state law to 11 U.S.C. § 523(a)(4):

... The reference to "trustee" authorizes a court to impose a *constructive trust* where appropriate to implement the Section (Emphasis added).

Plaintiff would urge that a recent Ninth Circuit decision, *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir.1986), supports

a finding by this Court that the judgment debt owed by Debtor is nondischargeable. The Circuit panel in *Ragsdale*, interpreting § 21 of the Uniform Partnership Act (which is identical to the Texas statute) to be the sort of trust *ex maleficio* not included within the purview of § 523(a)(4). However, the Circuit concluded that California courts had raised the duties of partners beyond those required by the literal wording of the Uniform Partnership Act. The Circuit concluded that the California courts had made all partner trustees over the assets of the partnership.

Partners are trustees for each other, and in all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his co-partner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind.

*Id.* at 796 citing *Leff v. Gunter*, 33 Cal.3d 508, 514, 189 Cal.Rptr. 377, 658 P.2d 740 (1983) [quoting *Page v. Page*, 55 Cal.2d 192, 197, 10 Cal.Rptr. 643, 359 P.2d 41 (1961) ].

Texas courts have not, to date, extended the partnership relationship beyond the frame of reference used in § 21 of the Uniform Partnership Act. Generally, the relationship is a broad fiduciary duty based upon trust, confidence, and good faith—far too broad from the narrow construction of fiduciary required by the Supreme Court cases previously cited. It is only when viewing the position of managing partners do Texas courts venture to impose the type of fiduciary duty described in *Ragsdale*. *See e.g., Huffington v. Upchurch* 532 S.W.2d 576 (Tex.1976) (managing partner of partnership enterprise owed copartners one of the highest fiduciary duties recognized in law); *Crenshaw v. Swenson*, 611 S.W.2d 886 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.) (managing partner in general partnership owes copartners highest fiduciary duty recognized in law); *Johnson v. Buck*, 540 S.W.2d 393 (Tex.Civ.

App.—Corpus Christi 1976, writ. ref'd n.r.e.).

This Court concludes that in the present case dealing not with a managing partner vis-à-vis general partners but with equal copartners; the scope of fiduciary duty described in *Ragsdale* is not applicable.

*Id.* at 566.

A similar result to that of the *Hurbace* court was reached in *In re Napoli*, 82 B.R. 378 (Bankr.E.D.Pa.1988) wherein the court relied on *In re Taylor*, and *In re Holman*, *supra*, and held that the Uniform Partnership Act enacted as New Jersey, N.J.S.A. 42:1–1 *et. seq.* did not create the type of technical or express trust required to find the fiduciary relationship necessary as a prerequisite to the determination of nondischargeability under § 523(a)(4). The *Napoli* court recognized *Ragsdale* and based on the analysis of *Haller* (erroneously referred to as *Lindley v. General Election*), 780 F.2d 797 (9th Cir.1986), *cert. denied* 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986), that although the Uniform Partnership Act creates a sort of trust *ex maleficio* not within the purview of § 523(a)(4), the common law of a state can raise the duties of a partner beyond the literal reading of the Uniform Partnership Act. The *Napoli* court concluded that the New Jersey Common Law did not create a general fiduciary relationship for partners for all purposes simply by virtue of the partnership relationship.

The Court's research revealed little Indiana Common Law as to the status and duties of a general partner to his limited partners in terms of a fiduciary relationship.

However, the Comments of the Indiana Supreme Court in the case of *Hannah, et. al. v. McLaughlin, et. al*, 158 Ind. 242, 63 N.E. 475 (1902) are somewhat enlightening. There Hannah, et. al. and one McLaughlin entered into a partnership for the purposes of acting as an agent for one Fleming in finding a purchaser for one Fleming. Fleming paid McLaughlin the commission which he wrongfully converted to his own use and that of his wife. The Court held

Hannah stated a cause of action versus McLaughlin, et. al. for an accounting and to recovery of the misappropriated partnership funds and stated:

The demurrers admit that the appellee Charles W. McLaughlin has, without the consent of his copartners, applied the partnership funds to the payment of his individual debt, in the discharge of a mortgage lien on real estate conveyed to his wife with notice of the fraud. *As between themselves, the appellee Charles W. McLaughlin must be regarded as a trustee of the firm for the partnership funds collected and held by him.* Where a trustee has in fact converted trust funds to his own use, or has, without authority, invested them in property into which they can be distinctly traced, the cestui que trust has the right to follow the same into the new investment; and where trust funds are invested in the hands of third persons, having knowledge of their character, *they still remain impressed with the obligation of the trust in the hands of the holders, and are subject to be reclaimed and restored to the trust fund. Pearce v. Dill*, 149 Ind. 136, 48 N.E. 788; *State v. Foster*, 5 Wyo. 199, 38 Pac. 926, 29 L.R.A. 226, 63 Am.St.Rep. 47; *Warren v. Bank*, 157 N.Y. 259, 51 N.E. 2036, 43 L.R.A. 256, 68 Am.St.Rep. 777; *Bank v. Brightwell*, 148 Mo. 358, 49 S.W. 994, 71 Am.St.Rep. 608, 614, note.

*Id.* at 63 N.E. 476 (Emphasis added).

Thus, it appears clear to the court that the Supreme Court has treated a general partner as a common law fiduciary with the same duties and standards of conduct as a *cestui que trust.* That is, the relationship of an express trust is established at the outset of the partnership agreement and is not merely an arrangement that can ripen into a constructive trust or a trust implied in law *ex maleficio.*

When there are no reported Indiana decisions on the issue in controversy, or the Court is faced with state law issue that is unsettled, the Federal Court must look to all available data and adopt a rule which it believes the Indiana Supreme Court would

adopt. *Heinhold v. Bishop Motor Exp., Inc.*, 660 F.Supp. 382 (N.D.Ind.1983); *Neofes v. Robertshaw Controls Co.*, 409 F.Supp. 1376 (S.D.Ind.1976). In making such a decision without an discernible doctrinal trend, the Court may reasonably assume that the state court will follow the rule that appears best to effectuate the policies that underlie the rule, *Bowen v. U.S.*, 570 F.2d 1311 (7th Cir.1978).

However, it must be remembered that whether the debtor's obligation is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) remains a *federal* question and this court need only look to state law for guidance on the issue of whether the debtor is a fiduciary or there has been a defalcation.

In looking to case law in other jurisdictions, it has been held that general partners owe a fiduciary duty to limited partners. *Homestake Mining Co. v. Mid Continent Exploration Co*, 282 F.2d 787, 799 (10th Cir.1960); *In Re Longhorn Secur. Litigation*, 573 F.Supp. 255, 271 (W.D. Okla.1983); *later proceeding* 573 F.Supp. 274, *later proceeding*, 573 F.Supp. 278; *Iowa Center Associates v. Watson*, 456 F.Supp. 1108 (N.D.Ill.1978); *Gundelach v. Gollehon*, 42 Colo.App. 437, 598 P.2d 521, 523 (1979); *Application of Grotzinger*, 81 App.Div.2d 268, 440 N.Y.S.2d 189 (1981).

It has also been held that the general partner, acting in complete control stands in the same fiduciary capacity to the limited partnership as a trustee stands to the beneficiaries of a trust. *Riviera Congress Associates v. Yassky*, 18 N.Y.2d 540, 277 N.Y.S.2d 386, 223 N.E.2d 876 (1966); *Watson v. Limited Partners of WCKT, Ltd.*, 570 S.W.2d 179, 182 (Tex.Civ.App.1978).

When the breach of fiduciary duty is alleged it has been held that the case is decided under the law of trusts. *Crenshaw v. Swenson*, 611 S.W.2d 886, 890 (Tex.App.1980).

The Court thus concludes although there is sparse Indiana case law on the point, that as to at least a limited partnership in Indiana, the duties of a general partner to his limited partners rises to a level that is considerably higher than the mere garden-variety type of commercial relationship such as creditor-debtor, principal-agent, bailor-bailee, client-broker, insurer-insured, and the like, and that there is established at the very outset of the partnership relationship an express fiduciary duty which is something more than a relationship wherein a constructive or implied trust is imposed *ex maleficio* after the wrong is committed and the debt incurred.

This Court agrees with the conclusion reached by the courts in *In re Kraus*, 37 B.R. 126, *supra*, and *In re Owens*, 54 B.R. 162, *supra*, that Indiana Code 23-4-1-21(1) establishes a fiduciary relationship at the outset of the agreement that falls within the federal definition of a fiduciary under § 523(a)(4). However, even assuming *arguendo* that this statutory provision did not establish such a relationship, it must be remembered that pursuant to I.C. 23-4-2-29 in any case not provided for by the Indiana Limited Partnership Act, the Indiana Rules of Law and Equity, including the Indiana Common Law shall govern. Thus, the Indiana Common Law case of *Hannah et al v. McLaughlin*, 63 N.E. 475, *supra*, is still a valid precedent for the proposition that a general partner is a fiduciary vis á vis his general partners. This conclusion is thus also in accord with the conclusion of the court in *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir.1986).

The final issue under § 523(a)(4) is whether there was a "defalcation" by the Debtor.

■ Once a fiduciary relationship is established "Defalcation" means something broader than "embezzlement" and in fact can be broader than "misappropriation". See Discussion Generally, 3 *Collier on Bankruptcy*, para. 523.14(b) (P. 523–105), *supra.*

■ It has thus been held that Defalcation precluding discharge includes the failure of a fiduciary to account for money he received in a fiduciary capacity, and it is irrelevant if the default by the fiduciary is innocent and the loss is due to negligence or ignorance. *Bellity v. Wolfington*, 48 B.R. 920, 923 (Bankr.E.D.Pa.1985); *In re*

*Hickey,* 41 B.R. 601, 603 (Bankr.E.D.Fla. 1984). This section thus covers cases where there is no fraud, embezzlement or willful misappropriation on the part of the debtor. *In re Niven,* 32 B.R. 354 *supra.* It is thus not necessary to prove an intentional wrong by the debtor once the technical or express trust is established. *In re Gonzales,* 22 B.R. 58 (BAP Cal.1982). Accordingly, using a trust fund for any purposes other than the purpose for which the trust fund was created is a nondischargeable defalcation. *In re Matheson,* 10 B.R. 652 (Bankr.Ala.1981).

■ Inasmuch as the debtor is a fiduciary, liability for defalcation is established under § 523(a)(4) when a proper accounting and payment of trust funds has not been made to the beneficiaries for any reason even though an embezzlement theft, or fraud has not technically occurred or been established.

■ Accordingly, the court finds that the Debtor is collaterally estopped from re-litigating those issues tried by the District Court, and that there is no genuine issue of material fact pursuant to Fed.R. Civ.P. 56 and that as a matter of law the Plaintiff is entitled to a summary judgment that the District Court judgment is nondischargeable pursuant to § 523(a)(2), (4) and (6) as discussed above.

The final issue is the *extent* to which the judgment is nondischargeable.

Clearly, the principal balance of $20,369.39, the pre-judgment interest of $17,737.48 for a total of $38,106.87 in compensatory damages plus any interest and costs due on the judgment itself are not dischargeable.

■ However, there is a split of authority as to whether the $8,000.00 in punitive damages is nondischargeable. The District Court award of $8,000.00 was based on the fact that the public interest would be served by inflicting this degree of punishment on the Debtor. The method of calculating the amount of the punitive damages was not discussed by the District Court.

It is noted that at 11 U.S.C. § 523(a)(2), (4) and (6) a debtor is not discharged "from

any *debt*" that is found to be nondischargeable under that section.

"Debt" is defined at 11 U.S.C. § 101(11) as "liability on a claim".

"Claim" is defined in its relevant part at 11 U.S.C. § 101(4)(A) as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secure or unsecured."

The Ninth Circuit in the case of *In re Adams,* 761 F.2d 1422, 1427–1428 (9th Cir. 1985), held that both compensatory and punitive damages are subject to findings of nondischargeability *citing, Coen v. Zick,* 458 F.2d 326 (9th Cir.1972), (construing section 523(a)(6) involving willful and malicious conduct). No prior state court judgment had been entered in the *Adams* case. *See also, In re Willis,* 2 B.R. 566 (Bankr.M. D.Ga.1980); *In re Carey,* 7 B.C.D. 6 (Bankr.S.D. Ohio 1980); *In re Cummings,* 3 B.C.D. 908 (Bankr.W.D.Mo.1977).

The court in *Birmingham Trust Nat. Bank v. Case,* 755 F.2d 1474, 1477 (11th Cir.1985) analyzed the concept of "debt" as defined at 11 U.S.C. § 101(11) and "claim" as defined at 11 U.S.C. § 101(4). Although the case did not involve the issue of the collateral estoppel effect of a prior state court judgment and punitive damages, the court held that a "debt" based on the plain language of the statute is an all or nothing proposition, and that the purpose of creating fraud exceptions to discharge was to discourage fraudulent conduct and to ensure that relief intended for honest debtors did not inure to the benefit of dishonest ones. The court also noted that one of the purposes of the fraud exception to discharge is to punish the debtor for engaging in fraudulent conduct.

The Court in *In re James T. Wilson,* 72 B.R. 956 (Bankr.M.D.Fla.1987) was a case based on securities fraud. The court gave collateral estoppel effect to the default judgment but denied that portion as to the statutory treble damages. There the Court stated:

Section 523(a)(2)(A) excepts from discharge only those monies actually ob-

tained by fraud.... The judgment as trebled cannot be excepted from discharge in its entirety because N.C.Gen. Stat. § 75–16 is an attempt by the North Carolina legislature to punish persons who engage in unfair and deceptive acts and practices affecting commerce. This exercise of police power by the North Carolina legislature is contrary to the purpose of bankruptcy and fraud exception to discharge and cannot be enforced under these circumstances. *See, Birmingham Nat. Bank. v. Case,* 755 F.2d 1474, 1477 (11th Cir.1985) (Footnote omitted).

*Id.* at 960.

The Court in *In re Record Co., Inc.,* 8 B.R. 57 (Bankr.S.D.Ind.1980), dismissing a § 523(a)(2) counter complaint for $100,000.00 in punitive damages (there being no prior state court judgment), without further discussion or citation of any authority, stated as follows:

> It is a well-established principle of bankruptcy that damages granted on nondischargeability complaints for obtaining money by false pretenses are limited to funds actually obtained by the representation. Consequential damages are not included, nor are punitive damages.

*Id.* at 60.

The Court in *Matter of Cheatham,* 44 B.R. 4 (Bankr.N.D.Ala.1984), gave collateral estoppel effect to a prior state court judgment, but held that the punitive damages awarded therein were dischargeable. The court noted as follows:

> This Court cannot, in equitable good conscience, punish the innocent unsecured creditors by virtue of a substantial depletion of the estate for a wrong committed by the debtor. As noted in *In re Ryan,* 15 B.R. 514, 520 (Bkrtcy.Md.1981), "[t]he intent of Congress was that unsecured creditors should be protected from 'the debtor's wrongdoing.'" (*citing* H.R. Rep. No. 95–595, 1st Sess. 382 (1977), U.S. Code Cong. & Admin.News 1978 p. 5787). The *maximum actual pecuniary loss suffered by the plaintiff as a result of the false pretenses is the amount paid for the automobile*—$900.00. Even if the car sold by the defendant had been absolutely worthless, the plaintiff would be adequately compensated by a damage award of $900.00. Before the Bankruptcy Code went into effect, there was a great deal of confusion and conflicting judicial interpretations of the dischargeability of punitive damages assessed against the debtor in prior proceedings. *See [In re] Beard, supra,* [5 B.C.D. 680] at 682, 683; *contra, U.S. v. RePass,* 688 F.2d 154, 157 (2d Cir.1982). Such uncertainty was principally due to the "provable debt" concept contained in Section 17 and Section 63 of the Bankruptcy Act. However, the Bankruptcy Code no longer refers to the provable and non-provable distinctions. The "provability" of a debt no longer has any bearing on whether or not the debt is dischargeable. *See* 3 *Collier on Bankruptcy,* Section 523.02 (15th ed. 1983). Thus, based on the maximum amount of actual loss suffered by the plaintiff and in the interest of fairness to the unsecured creditors, the Court concludes that the plaintiff is entitled to judgment in the amount of $900.00 and said amount is to be nondischargeable pursuant to 11 U.S.C. Section 523(a)(2)(A). The balance of the state court jury award is due to be allowed as an unsecured claim and is therefore dischargeable.

*Id.* at pp. 8–9.

*See also, In Matter of Church,* 69 B.R. 425 (Bankr.N.D.Tex.1987), *In re Brown,* 66 B.R. 13, 16 (Bankr.D.Utah, 1986), *In the Matter of Suter,* 59 B.R. 944 (Bankr.N.D. Ill.1986), and *In re Beard,* 5 B.C.D. 680 (Bankr.M.D.Tenn.1979) (an Act case holding that punitive damages were a penalty and not provable), where the Courts specifically held that punitive damages awarded in a prior state court judgment are not nondischargeable in bankruptcy where a prior state court judgment was given collateral estoppel effect.

In *Church,* the court gave collateral estoppel effect to a state court jury verdict, in which multiple damages were awarded to the creditor under a state deceptive prac-

tice act in addition to actual pecuniary loss. The state court also entered judgment for punitive fees and attorney's fees. The bankruptcy court noted that Texas law did not permit attorney's fees to be awarded as actual damages in a suit for fraud but that there were two potentially independent grounds for the award of attorney's fees— case law permitting attorney's fees when punitive damages are awarded and the Texas Deceptive Trade Practices Act. The court held that the attorney's fees awarded based on the fact the judgment also awarded punitive damages could not be held non-dischargeable, but that the attorney's fees could be nondischargeable based on the statute. The court cited *In re Suter*, 59 B.R. 944 *supra*, with approval as well as *In re Brown*, 66 B.R. 13, 16 (Bankr.D.Utah 1986).

In *In re Church*, the court stated as follows:

> The Debtor was also adjudged separately liable for an additional $25,000.00 punitive damages; duplicating the punitive damages awarded against Contemporary Homes and making the total judgment against the Debtor $112,672.34.
>
> Since the court has determined that summary judgment is appropriate as to the Section 523(a)(2)(A) claim of the Plaintiffs, it follows that the debt attributable to the "actual fraud" of the debtor should similarly be accorded summary treatment. The difficulty arises from the conflicting case law and the ambiguity of the statute. Section 523(a)(2) excepts from discharge any debt "for money, ... *to the extent obtained by*— (A) ... actual fraud, ... " (emphasis supplied).
>
> The Plaintiffs argue that the entire judgment debt must be found to be nondischargeable. They cite *Birmingham Trust National Bank v. Case*, 755 F.2d 1474 (11th Cir.1985), in support of this proposition. In that opinion the Court of Appeals held that, when a debt is declared non-dischargeable on the basis of a false representation in a financial statement, the entire debt is non-dischargeable and there is no off-set, so to speak, for the value of property returnable to

the creditor even though it may be the same property so obtained. Moreover, it has been held that a bankruptcy court may not find certain portions of a debt to be non-dischargeable and certain portions discharged. *In re McCall*, 59 B.R. 3 (Bankr.W.D.La.1986). It is noteworthy that in *Birmingham Trust* the statutory language quoted by the Eleventh Circuit omitted the phrase "to the extent obtained by". Unfortunately, the guidance of legislative history is lacking as to this statutory riddle. The leading treatise on bankruptcy indicates that the *Birmingham Trust* decision is not in complete accord with the 1984 amendments to the Code and that the phrase "to the extent obtained by" is limiting language. 3 *Collier on Bankruptcy*, para. 523.08 (1986).

It may be conceded that the statutory language is ambiguous and, though seemingly simple, difficult to apply to the actual case. In a recent opinion by Bankruptcy Judge Ginsberg, *Matter of Suter*, 59 B.R. 944 (Bankr.N.D.Ill.1986), it was held that the effect of the emphasized language of the statute quoted above was to preclude finding punitive damages such as were awarded by the state court against the Debtor here to be nondischargeable. It must be said that the punitive damages award of $50,000.00 against the Debtor cannot be considered to be within the language of Section 523(a)(2)(A). *In re Brown*, 66 B.R. 13, 16 (Bankr.D. Utah 1986). The same reasoning applies to the award of damages for emotional distress since this does not represent "money, property, or services, or ... credit ... obtained by ... actual fraud". Thus, an additional $5,000.00 must be eliminated from the nondischargeable debt determined today. *See In re Romero*, 535 F.2d 618 (10th Cir.1976). Likewise, the award of multiple damages under the Texas Deceptive Trade Practices Act cannot be included. Each of these components of the damages awarded under the state court judgment represents damages for something

other than actual pecuniary loss suffered by the Plaintiffs.

After having given careful consideration to the import of the statutory language, this court is of the view that the phrase "to the extent obtained by" requires that an actual pecuniary loss to the creditor result from the fraudulent conduct of the debtor that gave rise to the debt. This excludes from the nondischargeable debt under Section 523(a)(2)(A) those portions of the judgment debt that are in the nature of a penalty having no relation to the actual pecuniary loss resulting from the debtor's fraud.

*Id.* at 434–435.

In *Matter of Suter,* prior to the debtor's bankruptcy, the District Court had entered a judgment versus the debtor on the merits based on four counts, one count was based on RICO (18 U.S.C. § 1962(c)), and one count was for fraud as set forth in § 523(a)(2). The District Court trebled the civil damages pursuant to 18 U.S.C. § 1964(c). The bankruptcy court held the trebled damages dischargeable and stated as follows:

Section 523(a)(2)(A) excepts from discharge "any debt ... for money ... *to the extent obtained by* ... actual fraud." (emphasis added). The district court judgment here clearly is a debt for money under the Bankruptcy Code. However, § 523(a)(2)(A) precludes the dischargeability of a debt for money *only* to the extent the money was obtained by actual fraud. In this case, the debtor defrauded McCullough in the amount of $14,045.51. Because of the debtor's fraud, McCullough had to expend $7,141.14 in attorneys' fees in an attempt to recover his actual damages. The treble damages awarded by the District Court under RICO are punitive in nature and in no way alter the extent of the damages for money obtained by actual fraud. The trebling of McCullough's damages did not increase the amount of money which the debtor obtained from McCullough by actual fraud. That amount was and continues to be $14,-045.51. It is possible to argue that the attorneys' fees incurred by the debtor in obtaining the prebankruptcy judgment also represent a debt for money obtained by the debtor's actual fraud, although that analysis is admittedly strained at best. Thus, arguably $21,186.65 plus interest at the legal rate is the amount of the debt for money *to the extent obtained by* the debtor's fraud. It is not possible under any rational reading of the English language that two thirds of the trebling of McCullough's actual damages in any way represents a "debt for money ... to the extent obtained by ... actual fraud."

The result reached by this Court also accords with other provisions of the Bankruptcy Code, particularly § 523(a)(7). Section 523(a)(7) provides for the nondischargeability of a debt owed to a governmental unit for a fine, penalty, or forfeiture that is not compensation for any actual damages. In § 523(a)(7), Congress created a specific exception to discharge for noncompensatory damages. However, Congress clearly determined to not allow nongovernmental entities to seek the nondischargeability of punitive damages under § 523(a)(7). The language of §§ 523(a)(2)(A) and 523(a)(7) when read in harmony compel the conclusion that Congress intended noncompensatory damages to be excepted from discharge only where they are owed to a governmental entity pursuant to § 523(a)(7). No other result can be gleaned from interpreting the plain language of those sections.

Finally it must be remembered that § 523(a)(2)(A) is a provision conflicting with the fresh start philosophy of the Bankruptcy Code. Therefore, it should be read no more broadly than required to implement the policy underlying § 523(a)(2)(A), i.e. the policy against debtors avoiding fraud-based debts in bankruptcy. *See In re Prestridge,* 45 B.R. 681, 684 (Bankr.W.D.Tenn.1985); *In re Lipscomb,* 41 B.R. 112, 116 (Bankr.E.D. Va.1984). If McCullough collects $14,-045.51 plus interest and attorneys' fees from the debtor, he will be made whole.

If he collects $56,935.62, he will, in effect, receive a windfall in the amount of $35,748.97. The Bankruptcy Code intends the former result. It does not intend the latter. Section 523(a)(7) recognizes that debtors are to be punished by governmental units in (and after) bankruptcy cases, not by creditors. The motion to reconsider is denied.

*Id.* at pp. 946–47.

Are punitive damages awarded in a prior judgment which could have collateral estoppel effect to a private party in the nature of a fine or in the nature of punitive damages? It is clear that a fine, penalty or forfeiture payable to or for the benefit of a *governmental unit* is not dischargeable under § 523(a)(7). However, the judgment in question clearly provides that the punitive damages are awarded to the plaintiffs rather than to or for the benefit of a governmental unit. *Matter of Suter,* 59 B.R. 944 *supra.* They are not in the nature of a fine, penalty or forfeiture payable to or for the benefit of a governmental unit, and are thus not nondischargeable on that basis. Since they are treated as civil punitive damages payable to the plaintiff, are they nondischargeable in a dischargeability proceeding under § 523(a)(2), (4) or (6)?

 It has been held that statutorily authorized punitive damage awards are nondischargeable. *In re Maxwell,* 51 B.R. 244 (Bankr.S.D.Ind.1983). *See also, In re Adams, supra.* In *Maxwell,* the award of punitive damages by the state court in a summary judgment was held to be nondischargeable, since they were awarded pursuant to state law which rendered the actual debt nondischargeable. The court gave collateral estoppel effect to the prior state court judgment. Accordingly, unless it is clear that the state court determination of punitive damages was based on the exact same standard as used under the Bankruptcy Code, then the previous state court judgment has no effect on this Court's determination of the dischargeability of the punitive damage award. *Maxwell* involved a state court judgment concerning the debtor's "willful and malicious" conduct. The court in *Maxwell* gave a collateral estoppel

effect to a prior state court determinations as to the debtor's conduct. In *Maxwell,* the prior state court judgment was a summary judgment which awarded "punitive" damages based on I.C. 34–1–30–1 and I.C. 35–43–4–3 for criminal conversion. The court, through Judge Bayt, noted that Indiana law allows punitive damages "whenever the elements of fraud, malice, gross negligence or aggression mingle in the controversy", *citing, Gorman v. Sof-t Mate, Inc.,* 513 F.Supp. 1028, 1037 (N.D. Ind.1981), or "where the defendant is ... guilty of ... willful and wanton misconduct", *citing, Baker v. American States Insurance Co.,* 428 N.E.2d 1342, 1351 (Ind. App.1981). Judge Bayt did not discuss his holding in *In re Record Co., supra,* but that case is distinguishable from *Maxwell,* in that in *In re Record Co., supra,* there was no prior state court judgment which could be given collateral estoppel effect.

 The court concludes that when a pre-petition judgment results from the case being actually tried on the merits, in which punitive damages were awarded in the judgment and the judgment is entitled to collateral estoppel effect, the claimant is entitled to punitive damages in a nondischargeability proceeding, when they have been proven up by competent, clear and convincing evidence in the prior trial.

The "fresh start" policy of the Bankruptcy Code should have no application to a debtor who has committed a nondischargeable act that is so grievous that after a full trial on the merits, and after that court, with a full opportunity to observe the witnesses, awarded punitive damages based on clear and convincing evidence. The very purpose of § 523 is in fact to penalize the less than honest debtor for his misdeeds and thus the allowance of punitive damages is not inconsistent with the purposes of the Code in such an instance.

The prior court has adjudicated a fully liquidated "debt", prepetition, by entry of the judgment and once it has been accorded collateral estoppel effect by the Bankruptcy Court, the prevailing creditor should not be penalized by a reduction in the amount awarded for any portion that was punitive

in nature. Those punitive damages flow from the primary debt just as do attorney fees and interest, and should not be simply excised from the judgment because this court might feel those damages are too harsh. The entire judgment should either be given collateral estoppel effect, or it should not be given such effect. If the Debtor thought the District Court was erroneous, he should have exercised his appeal rights from that forum.

This court should not, in giving collateral estoppel effect to a prior judgment, also attempt to seize the role of a super-appellate court and second-guess the prior court after it has made thorough and complete findings of fact and conclusions of law.

Therefore, this Court hold that the punitive damages awarded by the District Court are also nondischargeable.

The Court thus having reviewed the complaint and answer filed herein and the Plaintiffs' motion for summary judgment together with the supporting memoranda and all of the papers and documents filed in support of the motions, and having taken in to consideration all admitted facts, the Court finds that no triable issue of material fact exists pursuant to Fed.R.Civ.P. 56 in that the entire District Court judgment is to be accorded collateral estoppel effect, and that the Plaintiffs are entitled to a summary judgment as a matter of law. It is therefore

ORDERED, ADJUDGED, AND DECREED that a Summary Judgment be entered in favor of the Plaintiffs and against the Defendant–Debtor.